FEDERAL ELECTION COMMISSION,
Plaintiff,

v.

The CHRISTIAN COALITION,
Defendant,

and

The Christian Broadcasting
Network, Intervenor,

and

Coopers and Lybrand, LLP,
Interested Party.

No. 2:97MC42.

United States District Court,
E.D. Virginia,
Norfolk Division.

Jan. 20, 1998.

Stephen E. Hershkowitz, Lawrence M. Noble, Erin Kathleen Monaghan, Richard B. Bader, Robert W. Bonham, III, Federal Election Commission, Holly J. Baker, Federal Election Commission, Office of General Counsel, Washington, DC, for Plaintiff.

Frank M. Northam, Webster, Chamberlain & Bean, Washington, DC, David Neil Ventker, Huff, Poole & Mahoney, P.C., Virginia Beach, VA, Alan P. Dye, Webster, Chamberlain & Bean, Washington, DC, James Bopp, Jr., Bopp, Coleson & Bostrom, Terre Haute, IN, for Defendant.

Karen Yvonne Kerley–Schwartz, Swidler & Berlin, Chtd., Michael L. Spafford, Swidler & Berlin, Chtd., Washington, DC, for Coopers & Lybrand L.L.P.

Joseph William Koegel, Jr., Steptoe & Johnson, Washington, DC, for Christian Broadcasting Network, Inc.

## OPINION AND ORDER

MILLER, United States Magistrate Judge.

This subpoena enforcement action presently pending comes before the undersigned U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(A), Fed.R.Civ.P. 72(a), and E.D.Va.R. 72.

### I. FACTUAL AND PROCEDURAL BACKGROUND

This case involves a subpoena enforcement action initiated by the Federal Election Commission (FEC). The FEC, alleging violations of federal election laws, has sued The Christian Coalition (TCC) in the U.S. District Court for the District of Columbia. *Federal Election Comm'n v. The Christian Coalition,* Civ. No. 1:96CV01781, *Complaint for Declaratory, Injunctive, and Other Appropriate Relief* (D.D.C.1996) ("the D.C. litigation"). TCC raised a defense in the D.C. litigation which implicates TCC's business and financial dealings with the Christian Broadcasting Network (CBN).

CBN is currently embroiled in an unrelated tax dispute with the Internal Revenue Service (IRS). To assist in its defense of the IRS action, CBN hired the accounting firm of Coopers and Lybrand (C & L) to investigate tax aspects of certain CBN business and financial dealings. In the course of C & L's providing accounting services and tax advice to CBN, both CBN and C & L generated several documents that directly touch on the financial and business dealings between CBN and TCC. Those documents are relevant in the D.C. litigation to both TCC's defense and to the substantive claims that the FEC has advanced in its complaint. *See Federal Election Commission v. The Christian Coalition,* No. 2:97MC42, *Memorandum of Law and Fact In Support of the Federal Election Commission's Motion to Compel Compliance with Subpoena Duces Tecum,* at 7 (E.D. Va. filed October 8, 1997).

The FEC wants those documents. To get them, the FEC caused a subpoena to issue from this Court commanding C & L to "[p]roduce all documents in [its] possession … which in any way relate or refer to Christian Coalition from 1989 to present." *Federal Election Commission v. The Christian Coalition,* No. 2:97MC42, *Subpoena in a Civil Case,* Attachment at 3 (May 23, 1997). C & L identified 90 documents that were responsive to the FEC's subpoena.

CBN intervened in this subpoena enforcement action. *See Federal Election Comm'n v. The Christian Coalition,* Misc. No. 2:97MC42, *Motion of the Christian Broadcasting Network, Inc., to Intervene,* at 2 (E.D.Va.) (entered October 17, 1997). CBN now seeks to shield these 90 documents from disclosure because, it claims, C & L prepared these documents in preparation for CBN's upcoming litigation with the IRS. Thus, CBN claims, the attorney-client and/or work product privileges protect the documents.[1] On

---

1. This Court has already decided that CBN's intervention in this enforcement action gives it standing to resist the subpoena on grounds of privilege or Rule 26(B)(3) protection. *See Feder-*

November 20, 1997, this Court heard oral argument on this matter. On November 26, 1997, this Court decided that the record presently before it was insufficient under *National Union Fire Insurance Co. v. Murray Sheet Metal Co., Inc.*, 967 F.2d 980, 985 (4th Cir.1992) to determine the privileged status of the 90 documents in question. Therefore, this Court ordered C & L to submit the documents under seal for an *in camera* inspection. *See Federal Election Commission v. The Christian Coalition*, No. 2:97MC42, *Opinion and Order*, at 9–11 (E.D.Va. entered November 26, 1997). Subsequent to its November 26 order, this court, over objection by the FEC, allowed CBN to submit *ex parte* for *in camera* inspection a Declaration from a C & L officer who provided additional clarifying information about the documents. *See Federal Election Commission v. The Christian Coalition*, No. 2:97MC42, *Order*, at 3–5 (E.D.Va. entered December 11, 1997).

The Court has carefully reviewed the parties' written memoranda, their oral arguments, C & L's explanatory declaration, and the documents themselves. This issue is now ripe for adjudication.

## II. *Attorney–Client Privilege*

CBN has claims that the attorney-client privilege protects 23 documents identified in *Federal Election Commission v. The Christian Coalition*, No. 2:97MC42, *Declaration of Stephen D. Halliday* (E.D.Va. filed under seal December 17, 1997) (hereinafter the "Halliday Declaration") from disclosure in response to the FEC's subpoena. Specifically, CBN claims that the attorney-client privilege protects Documents[2] 25, 26, 27, 29, 30, 31, 32, 33, 34, 36, 37, 40, 41, 47, 53, 56, 57, 58, 59, 60, 81, 84, and 86.

The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law. Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer being fully informed by the client. The lawyer-client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out. The purpose of the privilege is to encourage clients to make full disclosure to their attorneys.

*Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981).

■ Because CBN is the party asserting the attorney-client privilege, CBN must prove that the attorney-client privilege applies, that the privilege protects the documents in question, and that CBN did not waive the privilege. *See United States v. Aramony*, 88 F.3d 1369, 1389 (4th Cir.1996). *See also United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir.1982). *Accord Sheet Metal Workers Int. Ass'n v. Sweeney*, 29 F.3d 120, 125 (4th Cir.1994); *United States v. Tedder*, 801 F.2d 1437, 1441 (4th Cir.1986); *United States v. Under Seal*, 748 F.2d 871, 876 (4th Cir.1984). Additionally, CBN must prove that both CBN and its attorney, not just CBN alone, expected the document to remain confidential. *Aramony*, 88 F.3d at 1389 (4th Cir.1996). "In practical terms, this burden requires the proponent to explain, through *ex parte* submissions if necessary to

---

al Election Commission v. The Christian Coalition, No. 2:97MC42, Opinion and Order, at 3–5 (E.D.Va. entered November 26, 1997).

**2.** For clarity, the Court will refer to each document by the number that Stephen D. Halliday assigned it in *Federal Election Commission v. The Christian Coalition*, No. 2:97MC42, *Declaration of Stephen D. Halliday* (E.D.Va. filed under seal December 17, 1997)(hereinafter the "Halliday Declaration"). This numbering system corresponds with the number system on the CBN

Privilege Log which CBN delivered to the FEC. *See* Letter from J. William Koegel, Jr., counsel for CBN, to Stephen E. Hershkowitz, counsel for FEC, dated September 10, 1997, containing privilege log, attached as exhibit 8 to *Federal Election Commission v. The Christian Coalition*, No. 2:97MC42, *Memorandum of Law and Fact in Support of the Federal Election Commission's Motion to Compel Compliance with Subpoena Duces Tecum*, at 5–8 (E.D.Va. filed October 8, 1997).

maintain confidentiality, the significance or meaning of an otherwise cryptic document." *United States v. Under Seal,* 748 F.2d at 876.

To gain the protection of the attorney-client privilege, CBN must show, for each document, that:

(1) The asserted holder of the privilege is or sought to become a client; and

(2) the person to whom the communication was made:

(a) is the member of the bar of a court, or his subordinate; and

(b) in connection with this communication is acting as a lawyer; and

(3) the communication relates to a fact of which the attorney was informed:

(a) by his client

(b) without the presence of strangers

(c) for the purpose of securing primarily either

(i) an opinion on law; or

(ii) legal services; or

(iii) assistance in some legal proceeding and not

(d) for the purpose of committing a crime or a tort; [3] and

(4) the privilege has been

(a) claimed; and

(b) not waived by the client.

*United States v. Jones,* 696 F.2d 1069, 1072 (4th Cir.1982). *Accord, In re Grand Jury Proceedings,* 727 F.2d 1352, 1355 (4th Cir.

**3.** This creates the so-called "crime-fraud" exception to the attorney-client privilege.

**4.** In *United States v. Under Seal,* 748 F.2d at 874, n. 5, the Fourth Circuit cited with approval Supreme Court Standard 503(b), stating it "provides a comprehensive guide to the federal common law of attorney-client privilege." Standard 503(b) states:

"A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client, (1) between himself and his representative and his lawyer and his lawyer's representative, or (2) between

1984); *N.L.R.B. v. Harvey,* 349 F.2d 900, 907 (4th Cir.1965).

The attorney-client privilege applies not only to communications from the lawyer to the client, but also extends "to protect communications by the lawyer to his client, agents, or superiors, or to other lawyers in the case of joint representation, if those communications reveal confidential client communications." *United States v. Under Seal,* 748 F.2d at 874.[4] Not all communications between these parties, however, are privileged. Only those deemed confidential may be protected from discovery. Confidential communications are those "not intended to be disclosed to third persons other than in the course of rendering legal services to the client or transmitting the communications by reasonably necessary means." *United States v. Under Seal,* 748 F.2d at 874 (citing Supreme Court Standard 503(a)(4): "A communication is 'confidential' if not intended to be disclosed to third persons other than those to whom disclosure is in the furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication."). As the Fourth Circuit has said:

[T]he essence of the privilege is the protection of what was expressly made confidential or should have been reasonably assumed by the attorney as so intended.... [I]t is the unquestioned rule that the mere relationship of attorney-client does not warrant a presumption of confidentiality.

*United States v. Under Seal,* 748 F.2d at 875. (internal citations omitted).

his lawyer and his lawyer's representative, or (3) by him or his lawyer to a lawyer representing another in a matter of common interest, or (4) between representatives of the client, or (5) between lawyers representing the client."

Since January of 1988, either the law firm of Steptoe & Johnson or the law firm of Schwalb, Donnenfeld, Bray, & Silbert has represented CBN in its dispute with the IRS. *Halliday Declaration* at 2. At least since CBN retained counsel, C & L has assisted that counsel in preparing CBN's case. *Halliday Declaration* at 2. C & L prepared all the documents for which CBN now claims the attorney-client privilege after 1988. Therefore, the communications between CBN and C & L fit within category (1) of standard 503(b).

■ As a necessary corollary to the expectation-of-confidentiality doctrine, the attorney-client privilege does not extend to documents or communications relating to matters the client reveals or intends to reveal to others. *United States v. Under Seal,* 748 F.2d at 875.

The privilege of a party to withhold otherwise discoverable materials runs counter to traditional notions of discovery as a tool to reveal all relevant facts. *United States v. Under Seal,* 748 F.2d at 875 ("Although the [attorney-client] privilege has a venerable pedigree and helps to ensure competent and complete legal services, it is nonetheless inconsistent with the general duty to disclose and impedes the investigation of the truth."). *See also In re Grand Jury Proceedings,* 727 F.2d at 1355 ("The attorney-client privilege is in derogation of the public's right to every man's evidence") (internal citations omitted).

■ Because the attorney-client privilege is an exception from the otherwise liberal construction of discovery rules, *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947) ("[D]iscovery rules are to be accorded a broad and liberal treatment."), federal courts do not favor its use. *United States v. Oloyede,* 982 F.2d 133, 141 (4th Cir.1992). *See also In re Grand Jury Proceedings,* 727 F.2d at 1355. Therefore, assertions of attorney-client privilege are "to be strictly confined within the narrowest possible limits consistent with the logic of its principle." *In re Grand Jury Proceedings,* 727 F.2d at 1355 (internal citations omitted). *See also United States v. Oloyede,* 982 F.2d at 141; *Grand Jury Proceedings Under Seal v. United States,* 947 F.2d 1188, 1190 (4th Cir.1991) ("[T]he [attorney-client] privilege must be strictly construed."); *United States v. Tedder,* 801 F.2d at 1441; *N.L.R.B. v. Harvey,* 349 F.2d at 906.

With these controlling principles of law as a guide, the Court now turns to the merits of CBN's claim of attorney-client privilege.

### A.

#### *Threshold Matters Relating to In Camera Inspection*

The Court will first discuss three threshold matters relating to its *in camera* inspection of CBN's documents: (1) Fed.R.Evid. 104(a) and 1101(c) and their relation to the inspection; (2) Fed.R.Evid. 501 and the common law of attorney-client privilege relating to *in camera* inspection; and (3) FEC's failure to include the documents for which CBN claims attorney-client privilege in its motion to compel.

### 1.

#### *In Camera Inspection, Fed.R.Evid. 104(a), and Fed.R.Evid. 1101(c)*

Fed.R.Evid. 104(a) and Fed.R.Evid. 1101(c) directly bear on this Court's *in camera* inspection of CBN's documents to determine if the attorney-client privilege applies:

Preliminary questions concerning the qualification of a person to be a witness, *the existence of a privilege,* or the admissibility of evidence shall be determined by the court.... In making its determination, it is not bound by the rules of evidence *except those with respect to privilege.*

Fed.R.Evid. 104(a)(emphases added).

Rule 1101(c) provides: "The rule with respect to privileges applies at all stages of all actions, cases, and proceedings."

These Rules' plain language appears to say that this Court cannot order CBN to turn over its attorney-client privileged documents for *in camera* review. Rule 104(a) says that the law of attorney-client privilege binds this Court even in answering the preliminary question whether the privilege exists or not. Rule 1101(c) clearly makes the attorney-client privilege applicable in this subpoena enforcement action. In other words, these Rules lead to the seemingly inescapable conclusion that this Court may not view the actual privileged documents in determining whether or not the privilege actually applies.

■ Fortunately, the U.S. Supreme Court has resolved this apparent problem. Holding that such a literal reading of the rules would lead to an "absurd result," *United States v. Zolin,* 491 U.S. 554, 566, 109 S.Ct. 2619,

2627–28, 105 L.Ed.2d 469 (1989) [5], the Court found that "[t]he Rule does not provide by its terms that all materials as to which a claim of privilege is made must be excluded from consideration." *Id.* Therefore, under *Zolin,* Rules 104(a) and 1101(c) do not limit this Court to only extrinsic evidence in determining whether the attorney-client privilege applies. The Court may, consistent with *Zolin* and notwithstanding the language of Rule 104(a), consider the documents themselves *in camera* when ruling on whether CBN will enjoy the protection of the attorney-client privilege.

### 2.

*In Camera Inspection and Fed.R.Evid. 501*

Having determined that Rules 104(a) and 1101(c) do not prevent this Court from inspecting CBN's documents *in camera,* this Court now must decide if Fed.R.Evid. 501 allows such an *in camera* inspection:

> [T]he privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted in light of reason and experience.

Fed.R.Evid. 501.

■ Under Fed.R.Evid. 501, the law dealing with attorney-client privilege derives from the common law.[6] The question then becomes: does the federal common law of privileges allow this Court to make an *in camera* inspection of the document for which CBN claims the attorney-client privilege? *Zolin* answers this concern as well; the federal common law of attorney-client privilege allows this Court to conduct an *in camera* review of the documents for which CBN is claiming the attorney-client privilege. *See Zolin,* 491 U.S. at 568–570, 109 S.Ct. at 2628–30. *See also Kerr v. United States District Court for the Northern District of California,* 426 U.S. 394, 404–405, 96 S.Ct. 2119, 2124–25, 48 L.Ed.2d 725 (1976). This is because "disclosure of allegedly privileged material to the district court for purposes of determining the merits of a claim of privilege does not have the legal effect of terminating the privilege." *Zolin,* 491 U.S. at 568, 109 S.Ct. at 2628–29.

*Zolin* held that requiring the district court to rely on evidence extrinsic to the documents and not allowing the district court to view the documents themselves would "create[] ... too great an impediment to the proper functioning of the adversary process." *Zolin,* 491 U.S. at 569, 109 S.Ct. at 2629. Indeed, without first examining the 90 questioned documents, this Court would find it practically impossible to determine if CBN were justifiably claiming the attorney-client privilege. If this Court were not allowed to inspect the documents prior to ruling on the FEC motion, and was instead required to

---

5. It is important to note that *Zolin* dealt with the *in camera* inspection of materials for evidence relating to the crime-fraud exception to the attorney-client privilege. Therefore, *Zolin*'s holding is limited to cases where a litigant challenges a claimed attorney-client privilege on the basis of the crime-fraud exception. The FEC, of course, has made no such challenge to CBN's documents here. The presence of fraud in *Zolin* and the absence of fraud here has made this Court think carefully before applying *Zolin*'s principles to CBN's instant motion to compel.

This Court, in Section II(A) *supra,* has identified three threshold issues dealing with its *in camera* review of CBN's documents. The first threshold issue involves Fed.R.Evid. 104(a) and 1101(c). The second issue involves Fed.R.Evid. 501. The third issue involves the fact that the FEC's motion to compel makes no mention of the documents for which CBN has claimed the attorney-client privilege.

This Court finds the reasoning of *Zolin* compelling as it bears on the first two threshold issues present in this case. This Court has carefully considered the factual difference between *Zolin* and CBN's case here, and it finds that those factual differences are insufficient to make *Zolin*'s principles not applicable to the first two threshold issues the Court must decide.

However, as the Court explains more fully in Section II(A)(3) *infra,* the Court in answering the third threshold issue finds that the allegation of fraud present in *Zolin* distinguishes CBN's case here from *Zolin* sufficiently such that the FEC's failure to oppose CBN's claim of attorney-client privilege does not prevent this Court from inspecting the documents now *in camera* and ruling on CBN's privilege claims.

6. The attorney-client privilege as it is applied in federal court pursuant to Fed.R.Evid. 501 is a creature of federal common law. *See United States v. Under Seal,* 748 F.2d 871, 874 (4th Cir.1984) (attorney-client privilege has become part of the specialized federal common law).

rely solely on CBN's submissions concerning the documents' subject matter, then this Court would be forced simply to take CBN's word that the documents were privileged. The common law of privileges cannot be read to allow such a result. The Court holds, consistent with *Zolin* and *Kerr,* that the common law of attorney-client privilege allows this Court to examine CBN's documents *in camera* prior to determining if the privilege applies.

### 3.

*The FEC's Failure to Include in its Motion to Compel the Documents for Which CBN Claims the Attorney–Client Privilege*

The Court notes that the FEC has not opposed any of CBN's attorney-client privilege claims, and the FEC in its motion to compel has not demanded production of the attorney-client privileged documents. *See Federal Election Commission v. The Christian Coalition,* No. 2:97MC42, *Motion to Compel Compliance with Subpoena Duces Tecum Served on Coopers and Lybrand* (E.D.Va. filed October 8, 1997) (asking this Court to order C & L to produce only the "documents responsive to the subpoena which have been withheld under a claim of attorney work product"). *See also Federal Election Commission v. The Christian Coalition,* No. 2:97MC42, *Memorandum of Law and Fact in Support of the Federal Election Commission's Motion to Compel Compliance with Subpoena Duces Tecum,* at 5–8 (E.D. Va. filed October 8, 1997) (citing only Fed. R.Civ.P. 26(b)(3) in support of its motion). *See also Federal Election Commission v. The Christian Coalition,* No. 2:97MC42, *Federal Election Commission's Reply in Support of Its Motion to Compel Compliance with Subpoena Duces Tecum,* at 1–10 (E.D.Va. filed November 6, 1997) (citing only Fed.R.Civ.P. 26(b)(3) in support of its motion).

The FEC's failure to ask for these attorney-client privileged documents has given this Court pause in ordering and conducting an *in camera* inspection to determine if the attorney-client privilege applies. In *Zolin,* the Supreme Court held that a party attempting to defeat an attorney-client privilege claim first had to make a threshold showing that the privilege was not applicable before the district court could order and hold an *in camera* inspection. The party opposing the privilege had to first show the privilege was not applicable "by a factual basis adequate to support a good faith belief by a reasonable person," *Zolin,* 491 U.S. at 569, 109 S.Ct. at 2631, before the district court could examine the questioned evidence. In this case, not only has the FEC failed to make any threshold evidentiary showing that the privilege is not applicable, it has failed to even oppose CBN's claim to the attorney-client privilege.

In *Zolin,* a party attempted to defeat an attorney-client privilege claim by invoking the crime-fraud exception to the privilege. This Court finds that the holding of *Zolin* regarding the need for a threshold evidentiary showing should be limited to the narrow factual situation that was present in *Zolin.* Specifically, this Court holds that *Zolin's* requirement for a threshold evidentiary showing should be limited to the case where a party opposes the claimed attorney-client privilege with the crime-fraud exception.

There are several reasons why *Zolin* should be so limited. First, it is entirely consistent with federal practice to require a party alleging fraud to meet some higher pleading or evidentiary standard and not require the same standard from one not alleging fraud. *Cf., e.g.* Fed.R.Civ.P. 8 (setting forth lenient federal pleading standards) and Fed.R.Civ.P. 9(b) (setting out stricter pleading standard when a party's complaint alleges fraud). Additionally, fraud in a civil case requires proof by clear and convincing evidence where the normal civil standards by the preponderance of the evidence. *See e.g., Bond v. Commissioner of Internal Revenue,* 232 F.2d 822, 826 (4th Cir.1956)(requiring proof of fraud by clear and convincing evidence in a civil tax fraud case); *see also Buie v. System Automation Corp.,* 1990 WL 180126 at *9 (4th Cir.1990)(unpublished opinion) (requiring clear and convincing evidence of fraud in an employment contract action); *see also Lissmann v. Hartford Fire Insurance Co.,* 848 F.2d 50, 52 (4th Cir.1988) (re-

quiring clear and convincing evidence of fraud in an insurance contract action). It is entirely consistent with this philosophy that a Court require a party opposing the attorney-client privilege on the crime-fraud exception to make some sort of threshold evidentiary showing while not requiring the same showing in a case not involving fraud.[7] Accordingly, the Court will limit *Zolin's* holding that a party make a threshold evidentiary showing before *in camera* review is warranted to the situation where a party seeks to resist an attorney-client privilege claim under the crime-fraud exception. The FEC has made no fraud allegation here; therefore, the FEC does not have to make any showing whatsoever before this Court can order an *in camera* inspection of the documents for which CBN has claimed the attorney-client privilege.

Recall that CBN carries the burden under *United States v. Aramony*, 88 F.3d 1369, 1389 (4th Cir.1996) of proving that it has met each required element of the attorney-client privilege. The FEC's failure to oppose CBN's attorney-client privilege claim does not relieve CBN of this burden. Nor does the FEC's failure to oppose the privilege relieve this Court of its responsibility to review CBN's submissions to determine if CBN is properly claiming the privilege. It is the Court's ultimate responsibility to enforce its subpoena, and the Court has the responsibility of reviewing each privilege claim that could shield C & L from producing each required document. Therefore, the FEC's silence regarding CBN's invoking the attorney-client privilege notwithstanding, the Court will examine *in camera* each document for which CBN claims the attorney-client privilege to determine if the CBN warrants the privilege.

Having determined that neither the Federal Rules of Evidence nor the common law of privileges bars its *in camera* review of the documents, the Court turns to the merits of CBN's claim of attorney-client privilege.

### B.

### *The Attorney–Client Privilege for Documents 53 and 56*

The Court holds that Document 53 is not protected by the attorney-client privilege.

The Halliday Declaration says the following about Document 53: "This document is an expanded version of document no. 39 with marginal notations and was prepared for counsel in connection with potential litigation with the Internal Revenue Service." *Halliday Declaration* at 10. The Halliday Declaration classifies Document 39 only as Opinion Work Product. *Halliday Declaration* at 8. The Court has carefully reviewed both Documents 39 and 53 and finds that the typed material in both memos is substantially the same. The Court finds that the documents differ only in that Document 53 has handwritten marginal notes that are missing in Document 39. Therefore, CBN must be claiming that the handwritten notes change this document from work product privileged to attorney-client privileged.

█ Recall that CBN has the burden of proving every element applicable to the attorney-client privilege. *See United States v. Aramony*, 88 F.3d 1369, 1389 (4th Cir.1996). Nowhere in the Halliday Declaration or in any other submission by CBN does CBN identify the author of those handwritten marginal notes on Document 53.[8] There is no indication that these notes were written by an attorney or by a client within the requirements of the attorney-client test of *United*

---

**7.** Additionally, *Zolin* was concerned about parties using *in camera* inspections to go on "fishing expeditions" using the district courts as their "unwitting and ... unwilling agents." *Zolin,* 491 U.S. at 571, 109 S.Ct. 2619 (parentheses omitted). However, that concern is not present here. The FEC has not asked this Court to do anything relating to the documents for which CBN has claimed the attorney-client privilege. Not only has the FEC not gone fishing here; its boat never left the dock. The Court *sua sponte*

ordered this inspection. Therefore, *Zolin's* concern about parties going on fishing expeditions through *in camera* proceedings is not present in this case.

**8.** For every other document for which the Halliday Declaration claims the attorney-client privilege, it specifically identifies the presence and actions of counsel which form the basis for the attorney-client privilege claim.

*States v. Jones,* 696 F.2d 1069, 1072 (4th Cir.1982). The Halliday Declaration's description of Document 53 quotes a test applicable to the work product doctrine, not attorney-client privilege. The Court holds that CBN has not met its burden of proving how the marginal notes in Document 53 transform Document 53 from work product protected to attorney client privileged.

The Court holds that Document 56 is not protected by the attorney-client privilege. Document 56 is a C & L memo from Steve Halliday, a C & L partner; to Kay Kane, a C & L tax associate. Neither Halliday nor Kane are attorneys. The letter mentions Randy Morell, who is General Counsel for CBN, and it mentions a request that Morell made for a letter to be prepared, but the document itself is simply an internal memorandum between two non-lawyers that mentions no communications that might fall within the attorney-client privilege as defined by *United States v. Jones,* 696 F.2d 1069, 1072 (4th Cir.1982). Therefore, the Court holds that Document 56 does not fall under the attorney-client privilege.

### C.

### *The Attorney–Client Privilege for Documents 26, 36, 37, 41, 84, and 86*

The attorney-client privilege is like quicksilver. Initially difficult to grasp, once in one's possession it can easily slide though one's fingers. Disclosure of the communication to a third person is one of the quickest ways for one to lose the attorney-client privilege.

### 1.

### *Applicable Law Relating to the Effect of Third Party Disclosure on the Attorney–Client Privilege*

Third party disclosure has two effects on the attorney-client privilege. If the communication between attorney and client takes place in the presence of a third party, and that third party hears the communica-

tion contemporaneously with its being made, then the attorney-client privilege for that information never existed. *See* factor 3(b) in the attorney-client privilege test of *United States v. Jones,* 696 F.2d 1069, 1072 (4th Cir.1982). *See also In re Martin Marietta,* 856 F.2d 619, 623 (4th Cir.1988): "[I]f a client communicates information to his attorney with the understanding that the information will be revealed to others, the information ... will not enjoy the [attorney-client] privilege." If a client communicates to his attorney with a third person present, then certainly he cannot have the understanding that his communication will not be revealed to others.

If, on the other hand, the communication took place in private, between the attorney and the client alone, then the privilege comes into existence at the time the communication occurred. Subsequent disclosure to a third party then waives the privilege under factor 4(b) of the test of *Jones. See, e.g., U.S. v. Jones,* 696 F.2d 1069 (4th Cir.1982)(assuming attorney-client privilege existed at time of communication, publication of information waived the privilege).

Thus, it is technically proper to speak of waiver only in the case where the attorney or client communicates the privileged information to a third party after the privilege has come into existence. If the third party is present when the communication is made, it is not technically correct to say that the client has "waived" the privilege because one cannot waive what never existed.

Regardless of whether the privilege ever existed or whether it existed and the client waived it, the result for the communication revealed is the same. Under the common law of attorney-client privilege, the parties privy to the communication must zealously and carefully guard against disclosure to third parties. Courts in this area take almost a strict liability approach to third party disclosure. If the information ends up in the hands of a third party, courts don't want to hear how it got there.[9] Once in the hands of

9. This principle has limited exceptions, of course. For example, when a company carefully protects its privileged documents but they are stolen or

otherwise misappropriated and then revealed, some courts have held that this does not constitute a waiver of the attorney-client privilege. *Cf.,*

a third party, the privilege, if it ever existed, is lost.

## 2.

### *The Effect of CBN and C & L Disclosing Confidential Communications to Ralph Reed* [10]

■ Waiver principles are very important to this Court's resolving the issues presented by the FEC's instant motion to compel. ´ CBN claims the attorney-client privilege for Documents 36, 37, 41, 84 and 86. All these documents on their face recite the fact that Ralph Reed was present at the meeting from which the notes were generated. Because Ralph Reed, an individual outside of the C & L/CBN attorney-client relationship, was present during the meetings to which these documents relate, this Court holds that the attorney-client privilege never attached to these documents. *See Jones,* 696 F.2d at 1072 (factor 3(b)).

■ CBN also claims the attorney-client privilege for Document 26. This document memorializes a September 6, 1990 meeting relating to the CBN/TCC financial relationship. Present at the meeting were, among others, Stephen Halliday, partner at C & L; and Randy J. Morell, General Counsel of CBN. Document 26 relates on its face that Stephen Halliday called Ralph Reed on September 10, 1990, and talked to him about the substance of the meeting that was the subject of Document 26. Under these facts, the

Court holds that the attorney-client privilege attached to the communication at the meeting on September 6, 1990, but then Stephen Halliday waived the privilege by talking to Ralph Reed about the substance of the meeting four days later on September 10. *See Jones,* 696 F.2d at 1072 (factor 4(b)).

In determining the effect that these communications with Ralph Reed had on CBN's ability to now claim attorney-client protection for the affected documents, this Court has carefully considered the doctrine of joint defense privilege:

> The joint defense privilege originated in the context of codefendants whose attorneys shared information in the course of devising a joint strategy for their clients' defense. An exception to the general rule that disclosure to a third party of privileged information thereby waives the privilege, a joint defense privilege cannot be waived without the consent of all the parties who share the privilege.

*United States v. Under Seal,* 902 F.2d 244, 248 (4th Cir.1990).

Regardless of its origin in the criminal context, the Fourth Circuit has extended the privilege to the civil arena, renamed it the "common interest" privilege, and, as the renaming suggests, broadened it to include parties who share a common interest. *United States v. Under Seal,* 902 F.2d 244, 249 (4th Cir.1990). It approvingly cited cases where the privilege was very broadly extend-

---

*e.g., In re Dayco Corp. Derivative Securities Litigation,* 102 F.R.D. 468, 469 (S.D.Ohio 1984)(anonymous source's disclosure of documents to newspaper did not constitute waiver) and *In re Grand Jury Proceedings Involving Berkley & Co.,* 466 F.Supp. 863, 869–870 (D.Minn.1979)(disgruntled fired ex-employee stole documents and turned them over to the government. Court held that this disclosure did not constitute waiver).

*Berkley & Co.* is an excellent example of how courts strictly construe the disclosure waiver. The common law rule was that any disclosure, even by a thief who purloined the documents, operated as a waiver on the theory that a client should carefully protect the communications that he claims are privileged. *See* 8 J. Wigmore, *Evidence,* § 2325, at 633 (McNaughton rev. ed.1961) ("the risk of insufficient precautions is upon the client"). The *Berkley & Co.* court originally ruled that the theft had vitiated the defendant's attorney-client privilege, and the court

changed its mind only upon the defendant's motion to reconsider.

10. Ralph Reed was the Director of The Christian Coalition during the period of time when C & L generated the CBN/C & L documents at issue in this case. The record contains no indication of Ralph Reed's connection with either CBN or C & L. CBN, the party asserting the privilege, has submitted no affidavit or other evidence to show that Ralph Reed had any corporate, employment, or agency relationship with either CBN or C & L during the period when C & L generated the documents subject to the FEC's subpoena. Therefore, the Court finds that there is not sufficient evidence in the record to find that Ralph Reed had any employment or agency relationship with either CBN or C & L, the parties asserting the attorney-client privilege.

ed. Just how broad the joint defense privilege is can be seen from the following:

Whether an action is ongoing or contemplated, whether the jointly interested persons are defendants or plaintiffs, and whether the litigation or potential litigation is civil or criminal, the rationale for the joint defense rule remains unchanged: persons who share a common interest in litigation should be able to communicate with their respective attorneys and with each other to more effectively prosecute or defend their claims.

*United States v. Under Seal,* 902 F.2d 244, 249 (4th Cir.1990).

 Even under this expansive reading of the privilege, however, the Court holds that CBN cannot take advantage of the common interest privilege in relation to its communications with Ralph Reed. In every case cited by the Fourth Circuit to support its broad reading of the privilege in *Under Seal,* both parties claiming the common interest privilege were involved in some type of litigation. It is true that the prospect for litigation could be so remote that it involved "potential co-parties to prospective litigation," *United States v. Under Seal,* 902 F.2d 244, 249 (4th Cir.1990) citing *with approval In re LTV Securities Litigation,* 89 F.R.D. 595 (N.D.Texas 1981), but the prospect of litigation still had to be there.

The Fourth Circuit has admonished district courts not to "promote[] form over substance" when evaluating common interest privileges and to focus "not on when the documents were generated, but on the circumstances surrounding the disclosure of privileged documents to a jointly-interested third party." *United States v. Under Seal,* 902 F.2d 244, 249 (4th Cir.1990). After focusing its attention where the Fourth Circuit has directed, this Court finds that there is no evidence in the record to show that Ralph Reed or TCC was the subject of *any* actual, contemplated, or prospective litigation when CBN shared these privileged communications with Reed. The litigation looming on the horizon when C & L prepared these documents involved solely CBN and the IRS.

There is no indication that TCC or Ralph Reed was a target or was about to become the target of the IRS probe or any other litigation.

This Court finds that CBN and the IRS (not Ralph Reed or TCC) were the actual parties in interest in the IRS probe that occasioned production of the documents now in question. The Court finds no evidence that TCC or Ralph Reed personally were involved in any related, unrelated, on-going, or prospective litigation when the third-party disclosures occurred. The Court finds no evidence to suggest that the IRS was involving Reed or TCC in any tax audit. From the record before this Court, it appears that Ralph Reed was involved in the CBN/IRS litigation only to the extent he was supplying information to CBN to help it prepare for its IRS audit. Neither Reed or TCC received any benefit from CBN's sharing information with Reed. He was not "interested" in the CBN/IRS litigation in the sense that the outcome of the litigation would directly affect him or TCC.

This Court has focused on the circumstances surrounding CBN's disclosures to Reed. It now holds that Ralph Reed and TCC did not share a "common interest" with CBN insofar as that interest could excuse CBN's disclosure to Reed of information CBN now claims as privileged. Accordingly, the "common interest" privilege is not applicable in this case.

Thus, this Court holds that the attorney-client privilege never attached to Documents 36, 37, 41, 84 and 86 because Ralph Reed, a third party not privy to the CBN/C & L attorney-client relationship, was present at the meetings memorialized by these documents. The Court further holds that the attorney-client privilege initially did attach to the communications memorialized by Document 26, but that Stephen Halliday waived the privilege as to those communications on behalf of C & L and CBN by calling Ralph Reed on September 10, 1990 and talking to him about the meeting that was the subject of the memo.[11]

11. CBN has claimed that other privileges protect these documents. Specifically, for Documents

26, 36, 37, and 41 CBN has claimed opinion work product protection. For Documents 84

### 3.

#### *Scope of Waiving the Attorney–Client Privilege*

█ An extremely important corollary to the doctrine of waiver is that fact that in the Fourth Circuit there is no such thing as a limited waiver of the attorney-client privilege. In other words, if CBN has waived the attorney client privilege with respect to one document, it has waived the privilege not only with respect to that document, but also with respect to any information relied upon to produce that document:

> The Fourth Circuit has not embraced the concept of limited waiver of the attorney-client privilege. It has held that if a client communicates information to his attorney with the understanding that the information will be revealed to others, that information *as well as the details underlying the data which was to be published* will not enjoy the privilege.

*In re Martin Marietta Corp.*, 856 F.2d at 623 (internal quotation marks and citations omitted)(emphasis added).

█ Additionally, the Fourth Circuit recognizes the concept of subject matter waiver. That is, when a party waives the attorney-client privilege as to one document or communication, it may waive the attorney-client privilege as to *all* documents that bear on the same subject matter.[12] *See In re Martin Marietta Corp.*, 856 F.2d at 623 (dicta) ("we agree that a subject matter waiver has been worked ... "); *see also In re Weiss*, 596 F.2d 1185, 1186 (4th Cir.1979)(refusing to reverse a district court finding that a defendant has effected a subject matter waiver); *see also Jones*, 696 F.2d at 1072:

> Any voluntary disclosure by the client to a third party waives the privilege not only as to the specific communication disclosed, but often as to all other communications relating to the same subject matter. *In re Sealed Case*, 676 F.2d 793, 808–09 (D.C.Cir.1982). In *Sealed*, the court stated that when a party reveals part of a privileged communication to gain an advantage in litigation, the party waives the attorney-client privilege as to all other communications relating to the same subject matter.... The *Sealed* court noted, however, that courts apparently retain discretion not to impose full waiver as to all communications on the same subject matter when the client has merely disclosed a communication to a third party, as opposed to making some use of it.

*Jones*, 696 F.2d at 1072 (selected citations omitted).

Therefore, the Fourth Circuit recognizes the concept of subject matter waiver; yet, subject matter waiver is appropriate only when the party seeking the privilege previously waived the attorney-client privilege to make some tactical use of the documentation. When the party simply relates the communication to a third person, and does not try to use the documentation to its advantage in litigation, then a court's finding subject matter waiver would be an error of law.[13]

and 86, CBN has claimed non-opinion work product protection. *See The Halliday Declaration*, at 5–7. The Court's holding in this section of the opinion is limited solely to the attorney-client privilege. The Court will discuss the other privileges claimed for these documents in later sections of this opinion.

**12.** Recall the difference between waiving the privilege (revealing the communications to someone subsequent to the privilege attaching) and the privilege never having attached in the first place (making the communication in the contemporaneous presence of a third person). This distinction causes confusion in analyzing subject matter waiver. The Fourth Circuit speaks of the "waiver" as to one document effecting a subject matter "waiver" as to all documents. Does the same analysis apply to the case where the privilege has not been technically "waived," but instead never attached in the first place? In other words, if CBN and C & L made their communication with Ralph Reed present, they did not really "waive" the privilege because no privilege ever came into existence. Would such a communication also act to remove the attorney-client privilege from communications of the same subject matter?

This question would be crucial in this case had the Court found a document that CBN has used in litigation to its advantage. However, the Court need not reach that question here because it has determined that subject matter waiver is not an issue.

**13.** In the Fourth Circuit, the review standard of a district court's disposition of an attorney-client privilege question is two-fold:

> To the extent a district court's holding that the attorney-client privilege does not protect com-

The record before the Court does not show that CBN or C & L has ever used in litigation any of the information they communicated to Ralph Reed. C & L developed these documents preparing for CBN's litigation with the IRS; however, there is no evidence in the record before this Court that would support any finding that CBN has used these documents to its advantage in any IRS litigation.

■ Therefore, this Court holds that even though CBN cannot claim the attorney-client privilege for Documents 26, 36, 37, 41, 84, and 86 because in some way CBN revealed their information to Ralph Reed, CBN's revealing this information to Ralph Reed did not effect a subject matter waiver of all documents pertaining to the CBN/TCC relationship for which CBN now claims attorney-client privilege.

### D.

### *The Attorney–Client Privilege for Documents 25, 27, 29, 30, 31, 32, 33, 34, 40, 47, 57, 58, 59, 60, 81*

The Court has reviewed each of the above-listed documents against the requirements of *United States v. Jones,* 696 F.2d 1069, 1072 (4th Cir.1982). The Court holds that the attorney-client privilege protects Documents 25, 27, 29, 30, 31, 32, 33, 34, 40, 47, 57, 58, 59, 60, 81.

### E.

### *Summary*

In summary, for all the documents for which CBN claims the attorney-client privilege, the Court holds that:

1. The attorney-client privilege absolutely protects documents 25, 27, 29, 30, 31, 32, 33, 34, 40, 47, 57, 58, 59, 60, 81 from disclosure.

2. The attorney-client privilege never attached to documents 36, 37, 41, 84, and 86 because Ralph Reed was at the meetings which those documents memorialize.

munications rests essentially on determinations of fact, we review those determinations for clear error. Our review is *de novo,* however, to the extent the court's holding rests on the

3. CBN waived the attorney-client privilege to document 26 because it communicated the substance of the document to Ralph Reed.

4. The attorney-client privilege never attached to documents 53 and 56 because these documents did not meet the substantive requirements of the test for attorney-client privilege. *See United States v. Jones,* 696 F.2d 1069, 1072 (4th Cir.1982).

### III. *Opinion Work Product*

CBN claims Opinion Work Product protection for the following 58 documents: 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15, 18, 19, 20, 23, 26, 32, 34, 35, 36, 37, 38, 39, 41, 43, 44, 45, 46, 48, 52, 53, 54, 55, 58, 61, 63, 64, 65, 66, 67, 68, 69, 71, 72, 73, 74, 75, 76, 79, 80, 81, 82, 83, 88, and 90. Of these, documents 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 66, 74, 75, 76, and 80 are duplicates of previously-listed documents.

This Court just determined that the attorney-client privilege protects Documents 32, 34, 58, and 81 from disclosure. Therefore, this Court will not reach the question regarding these documents' work product status.

This Court has previously set out Fourth Circuit law on the matter of opinion work product in *Federal Election Commission v. The Christian Coalition,* No. 2:97MC42, *Opinion and Order,* at 6–8 (E.D.Va. entered November 26, 1997). Fed.R.Civ.P. 26(b)(3) provides the opinion work product protection which CBN wants to invoke:

In ordering discovery of [trial preparation] materials when the required showing has been made, the court shall protect against disclosure of the *mental impressions, conclusions, opinions, or legal theories* of an attorney or other representative of a party concerning the litigation.

Fed.R.Civ.P. 26(b)(3) (emphasis added).

■ The Fourth Circuit prohibits absolutely the discovery of any opinion work product:

Thus, the jurisprudence of Rule 26(b)(3) . . . divides work product into two parts,

application of controlling legal principles to the facts.
*In re Allen,* 106 F.3d 582, 601 (4th Cir.1997)(internal quotations and citations omitted).

one of which is "absolutely" immune from discovery and the other only qualifiedly immune.... [T]he pure work product of an attorney insofar as it involves mental impressions, conclusions, opinions, or legal theories concerning litigation is immune to the same extent as attorney-client communications ... All other documents and tangible things prepared in anticipation of litigation or for trial may be discovered, but only upon a showing of substantial need. Thus, in resolving the question of whether matters are immune from discovery because of a work product rule, attention must be turned first to whether the documents or tangible things were prepared in anticipation of litigation or for trial and then, for materials other than legal opinion or theory, to whether the requesting party has demonstrated substantial need.

*National Union Fire Insurance Co. v. Murray Sheet Metal Co., Inc.,* 967 F.2d 980, 983–84 (4th Cir.1992).[14]

This Court cannot compel C & L to turn over any document that this Court classifies as opinion work product. Thus, the Court must review each document in question and determine if it contains any mental impressions, conclusions, opinions, or legal theories of any of CBN's representatives. If it does, then the Court cannot order C & L to hand that information over to the FEC.

Prior to reviewing the substance of CBN's work product claim, however, the Court must take up a threshold matter: third-party-disclosure waiver of work product protection.

### A.

### Third Party Disclosure and Waiver of Opinion Work Product Protection

Recall from Section II *supra* that disclosure of attorney-client-privileged documents

to third parties waived CBN's attorney-client privilege to that document, waived CBN's attorney-client privilege to the facts underlying the production of the document, and could have (but didn't) waive CBN's attorney-client privilege to any document touching on the same subject matter. The law regarding third-party waiver of work product protection is completely different.

The attorney-client privilege exists to encourage the client to communicate with his lawyer. Work product protection, on the other hand, exists to encourage an attorney to prepare effectively for litigation. It would be consistent with the purpose of the work product protection to *encourage* sharing of the material with anyone who could help the attorney prepare for trial. It would completely stand the work product doctrine on its head to allow discovery of an attorney's work product simply because that attorney shared it with someone who was helping him prepare for litigation:

> [The work product protection] does not exist to protect a confidential relationship, but rather to promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery of the opponent. The purpose of the work product doctrine is to protect information against opposing parties, rather than against all others outside a confidential relationship, in order to encourage effective trial preparation.... We conclude, then, that while the mere showing of a voluntary disclosure to a third person will generally suffice to show waiver of the attorney-client privilege, it should not suffice in itself for waiver of the work product privilege.

*United States v. American Telephone and Telegraph Co.,* 642 F.2d 1285, 1299 (D.C.Cir. 1980).

▮▮ Applying this principle to the subpoena enforcement action presently before this Court, the Court holds that CBN did not

---

**14.** In making the work product privilege co-terminal with the attorney-client privilege, the Fourth Circuit granted absolute immunity from disclosure of attorney opinion work product. *See Better Government Bureau, Inc. v. McGraw,* 106 F.3d 582, 600 (4th Cir.1997)(where applicable, the attorney-client privilege is absolute and affords the privileged party complete protection from disclosure).

Not all circuits protect opinion work product as absolutely as the Fourth Circuit. *See United States v. Brown,* 478 F.2d 1038, 1041 (7th Cir.1973)(allowing discovery of opinion work product under an IRS subpoena upon a showing by the government of "substantial need" because of the public policy of enforcing the nation's revenue laws). However, this Court, of course, is bound by Fourth Circuit law.

waive its opinion or non-opinion work product[15] protection for any document which CBN showed to Ralph Reed. It is obvious from the record before this Court that Reed was not CBN's litigation adversary. On the contrary, Reed was cooperating with CBN by supplying CBN with information it needed to defend against the IRS audit. Therefore, consistent with the philosophy of the work product doctrine, this Court holds that any work product protection that attached to any document prepared by C & L in preparation for CBN's IRS audit was not waived when CBN subsequently shared the information in the document with Ralph Reed.

Having found that CBN did not waive by disclosure Fed.R.Civ.P. 26(b)(3)'s work product protection for any document, the Court now turns to the merits of CBN's work product claims. The Court will examine each document for which CBN claims opinion work product protection. It will define as work product any mental impressions, conclusions, opinions, or legal theories of any CBN representative. *See* Fed.R.Civ.P. 26(b)(3). Using that definition, this Court will classify each document as either fully opinion work product, fully non-opinion work product, or a mixture of opinion and non-opinion work product. For those documents that are a mixture of opinion and non-opinion work product, the Court will identify which sections are opinion work product.

### B.

### *Work Product Document Analysis*

### *Document 1*

Document 1 is a mixture of opinion and non-opinion work product. The following is opinion work product in document 1:

(1) The third and fourth sentence of paragraph 1 of page 1, starting with "As you are aware" and ending with "non-arm's length treatment." (Legal Theory).

(2) Under the heading "General Problems With The Relationship":

(a) All of subparagraphs 1, 1a, 1b, 2, 3, and 4. (Legal Strategy).

(3) Under the heading "Specific Problems with the Relationship":

(a) All of the introductory paragraph beginning "The Bulk" and ending "see sheets # 1." (Legal Theory).

(b) All of subparagraphs 1, 2, 3, and 4. (Legal Strategy).

(c) All of the concluding paragraph starting with "The latest" and ending with "subsidy." (Legal Strategy).

(4) In the section that starts out "In addition to the foregoing":

(a) the last sentence of subparagraph 3, which starts with "Everyone" and ends with "position." (Legal Strategy).

(5) In the tabular data appended to Document 1:

(a) On page 2 of the tabular data, the handwritten marginal notation that starts with "If this were" and ends with "cut." (opinion).

Everything else in Document 1 contains facts, not mental impressions, conclusions, opinions, or legal theories of any CBN representative. Accordingly, the Court classifies

---

15. In the Fourth Circuit, there is a major difference between opinion and non-opinion work product when it comes to the doctrine of subject matter waiver. Specifically, revealing non-opinion work product to an adversary works a subject matter waiver of all non-opinion work product. However, there can be no subject matter waiver of opinion work product.

The Fourth Circuit has previously rejected the limited waiver concept as to the attorney-client privilege and as to non-opinion work product. We have embraced the limited waiver concept as to opinion work product.
[Does] subject matter waiver appl[y] with equal vigor to opinion work product[?] We

hold that the doctrine does not apply to such materials.
*In re Martin Marietta Corp.*, 856 F.2d 619, 623, 625–26 (4th Cir.1988).
*See also Duplan Corporation v. Deering Milliken*, 540 F.2d 1215, 1222 (4th Cir.1976)(broad concepts of subject matter waiver analogous to those applicable to claims of attorney-client privilege are inappropriate when applied to Rule 26(b)(3)).
However, because the Court holds that CBN did not waive its work product protection as to any specific document by sharing information on that document with Ralph Reed, this Court need not undertake any analysis of any work product subject matter waiver.

the rest of the document as non-opinion work product. This is especially true of the five pages of tabular data appended to the document.

### Document 2

Document 2 is a mixture of opinion and non-opinion work product. After carefully reviewing Document 2, the Court finds that it is mostly fact-based. The following two statements are conclusions, so the Court will classify these statements as opinion work product. These statements are located as follows:

(1) In paragraph two of page one, the parenthetical notation between "wrote" and "just" is opinion work product. (Conclusion).

(2) In paragraph seven, the notation starting with "not too much" and ending with "labor" is opinion work product. (Conclusion).

The Court classifies the remainder of Document 2 as non-opinion work product.

### Document 3

Document 3 is a mixture of opinion and non-opinion work product. The following is opinion work product in document 3:

(1) Paragraph two, page one. From the sentence "While a detailed analysis will follow" to the bottom of the page at the sentence which ends "in a profit making mode," inclusive. (Conclusion and Opinion).

(2) In the first paragraph on page two, the sentence beginning "Apparently, this only lasted" and ending "work themselves." (Conclusion and opinion).

(3) Continuing on page two, the entire second paragraph consisting of one sentence beginning with "Because of the foregoing ." (Conclusion).

(4) On page three (labeled page 1 but the third page of the document) under "Detailed Adjustment Analysis," under subparagraph (1) listed "000056", the sentence starting "Apparently" and ending "CC" is opinion work product. In the same subparagraph, the sentence starting "In other words" and ending "client" is opinion work product. (Conclusion).

(5) On page four (labeled page 2 but the fourth page of the document), under subparagraph (4) listed "002591":

(a) the first two full sentences starting with "David stated" and ending with "on my part, however." (Conclusion and Mental Impression).

(b) the last sentence starting "is it not" and ending "a fair price." (Opinion).

(6) On page four (labeled page 2 but the fourth page of the document), under subparagraph (5) listed "002592":

(a) the eighth word in the first full sentence starting with "This engagement." (Opinion).

(b) In the sixth sentence, the clause which starts "which David Hummel" and ends with "excessive." (opinion).

(c) The entire seventh sentence, starting with "Given the statements" and ending with "project." (Conclusion).

(d) The entire ninth sentence, starting with "It is very obvious" and ending with "Ralph." (Conclusion and Opinion).

(e) The entire twelfth and thirteenth sentences, starting with "I strongly suspect" and ending with "actually involved." (Conclusion and Opinion).

(7) On page five (labeled page 3 but the fifth page of the document), under subparagraph (6) listed "002593":

(a) The entire third sentences, starting with "Accordingly" and ending with "*only.*" (Conclusion).

(8) On page five (labeled page 3 but the fifth page of the document), under subparagraph (7) listed "002594":

(a) The remainder of subparagraph (7) after the first semicolon in the second sentence. Starting at "this would leave" and ending with "(in a perfect world)." (Mental Impressions, Conclusions, and Opinions).

(9) On page five (labeled page 3 but the fifth page of the document), under subparagraph (8) listed "002595":

(a) The first full sentence, starting with "Apparently" and ending with "completion." (Conclusion).

(10) On page six (labeled page 4 but the sixth page of the document),under subparagraph (16) listed "003502":

(a) From the second full sentence, starting with "It should be noted," to the fourth full sentence, ending "at the adjusted figures," inclusive. (Conclusion).

(11) Starting on page six (labeled page 4 but the sixth page of the document), and carrying over to page seven (labeled page 5 but the seventh page of the document) under subparagraph (18) listed "003508":

(a) The second sentence starting with "Apparently" and ending with "charges." (Conclusion).

(12) On page seven (labeled page 5 but the seventh page of the document), under subparagraph (19) listed "003680":

(a) The part of the first (and only) sentence starting with "that was apparently" and ending with "this job." (Conclusion).

(13) On page seven (labeled page 5 but the seventh page of the document), under subparagraph (21) listed "003690":

(a) The remainder of the second sentence after "which leaves about," inclusive. (Conclusion).

(b) The entire third sentence, from "In the *RRL*" to "address." (Opinion).

(c) The remainder of the fourth sentence after "which is," inclusive. (Conclusion).

(14) On page seven (labeled page 5 but the seventh page of the document), under subparagraph (22) listed "003707":

(a) The entire second, third, and fourth sentences, starting with "According to" in the second sentence and ending with "on this job" in the fourth sentence. (Conclusion).

(15) On page eight (labeled page 6 but the eighth page of the document), under subparagraph (27) listed "003749":

(a) The entire sixth sentence, starting with "The $62.50" and ending with "between David and Ralph." (Conclusion).

(16) On page eight (labeled page 6 but the eighth page of the document) and carrying over to page nine (labeled page 7 but the ninth page of the document) under subparagraph (30) listed "003783":

(a) The entire fourth and fifth sentences, starting with "However, he did state" and ending with "for the labor." (Opinion).

(17) On page nine (labeled page 7 but the ninth page of the document), under subparagraph (31) listed "003854":

(a) The entire second sentence, starting with "The *FAB*" and ending with "$500.00." (Conclusion).

(18) On page nine (labeled page 7 but the ninth page of the document), under subparagraph (32) listed "003855":

(a) The entire third sentence, starting with "This would leave" and ending with "the *FAB*." (Conclusion)

(b) The entire fourth sentence, starting with "According to" and ending with "binders." (Opinion).

(19) On page nine (labeled page 7 but the ninth page of the document), under subparagraph (33) listed "003860":

(a) The second sentence beginning with "Apparently" and ending with "Coalition." (Conclusion).

(20) On page nine (labeled page 7 but the ninth page of the document) under subparagraph (34) listed "003861":

(a) The entire second sentence, starting with "The only explanation" and ending with "job would be." (Conclusion/Opinion).

(21) On page ten (labeled page 8 but the tenth page of the document), under subparagraph (35) listed "004016":

(a) In the fourth sentence, starting with the clause "because he felt" and ending with "that he had." (Opinion/Conclusion).

(b) The entire fifth sentence, starting with "David Hummel" and ending with "format." (Opinion).

(22) On page ten (labeled page 8 but the tenth page of the document), under subparagraph (38) listed "004082":

(a) The entire second sentence, starting at "Apparently" and ending with "billed or paid." (Conclusion).

(23) On page ten (labeled page 8 but the tenth page of the document), under subparagraph (39) listed "004132":

(a) The entire second sentence, starting at "Apparently" and ending with "paid on it." (Conclusion).

(24) On page ten (labeled page 8 but the tenth page of the document), under subparagraph (41) listed "004144":

(a) The entire second sentence, starting at "Apparently" and ending with "billed or paid." (Conclusion).

(25) On page eleven (labeled page 9 but the eleventh page of the document), under subparagraph (43) listed "004196":

(a) The entire second sentence, starting at "Apparently" and ending with "completion." (Conclusion).

(26) On page eleven (labeled page 9 but the eleventh page of the document), under subparagraph (44) listed "004197":

(a) The entire second sentence, starting at "Apparently" and ending with "completion." (Conclusion).

(27) On page eleven (labeled page 9 but the eleventh page of the document), under subparagraph (45) listed "004200":

(a) The entire second sentence, starting at "Apparently" and ending with "completion." (Conclusion).

(28) On page eleven (labeled page 9 but the eleventh page of the document), under subparagraph (46) listed "004221":

(a) The entire second sentence, starting at "Apparently" and ending with "completion." (Conclusion).

(29) On page eleven (labeled page 9 but the eleventh page of the document), under subparagraph (48) listed "004268":

(a) The remainder of the first sentence after "which David Hummel thought," inclusive. (Opinion).

(b) The entire third and fourth sentences, inclusive, starting with "This leaves" and ending with "discount." (Conclusion/Opinion).

(30) On page eleven (labeled page 9 but the eleventh page of the document) and carrying over to page twelve (labeled page 10 but the twelfth page of the document) under subparagraph (50):

(a) The seventeenth word in the second sentence, between "the" and "brochure." (Opinion).

(b) The entire last sentence, starting with "Given the nature" and ending with "items." (Conclusion/Opinion).

(31) On page twelve (labeled page 10 but the twelfth page of the document) under subparagraph 51:

(a) The entire subparagraph after the first sentence (from the second sentence to the last, inclusive). (Opinion and Conclusions).

Everything else in Document 3 contains facts, not mental impressions, conclusions, opinions, or legal theories of any CBN representative. Accordingly, the Court classifies the rest of the document as non-opinion work product.

### *Document 15*

Document 15 is a mixture of opinion and non-opinion work product. The following is opinion work product in Document 15:

(1) Under the heading "Brochure":

(a) In the unnumbered subparagraph labeled "# 56 (001063)", on the first page of the document and carrying over to the second page:

(i) The second sentence, starting "John" and ending "added in." (Conclusion).

(ii) In the eighth sentence, the clause immediately following the semicolon, starting with "8.5¢" and ending with "added on." (Conclusion).

(iii) The entire ninth sentence, starting with "John said" and ending with "4.5¢" each. (Opinion).

(2) Under the heading "Gift Card and Response", on page two of the document:

(a) The entire second sentence, starting with "because" and ending with "went out with." (Conclusion).

(b) The entire fifth sentence, starting with "CBN printing" and ending with "than they could." (Opinion).

(3) Under the heading "Print Shop Conclusions" [16] on page three of the document:

---

16. Even though the heading is labeled "Conclu-

sions," the Court finds that only a small part of

(a) In subparagraph 4, in the second sentence, the parenthetical phrase between "modest profit" and "and covered his costs." (Conclusion/Opinion).

(4) Under the heading "Marketing" on page three of the document and carrying over to page four of the document:

(a) First paragraph (unnumbered):

(i) Second sentence starting with "The rationale" and ending with "adjustment." (Conclusion).

(b) All of subparagraphs 1, 2, 3, and 4, inclusive. (Conclusion).

(5) Under the heading "Conclusion" on page four of the document:

(a) The entire section. (Conclusion).

### Document 18

Document 18 is a mixture of opinion and non-opinion work product. The Court holds that this entire handwritten document is opinion work product except for the notation on page 5 that says: "David—Mktg. guy is on Board of Va. Christ. Coal. Chapter." The Court holds that this is non-opinion work product because it is a statement of fact.

### Document 19

The Court holds that Document 19 is opinion work product in its entirety.

### Document 20

The Court holds that all of Document 20 after the fourth sentence, inclusive, of the first paragraph is opinion work product. The Court classifies this portion of the document as opinion work product because it lays out a strategy for continuing C & L's investigation of the CBN/TCC relationship.

The rest of Document 20 simply relates invoice amounts and is, therefore, non-opinion work product.

### Document 23

The first paragraph of this document is non-opinion work product. The second paragraph, consisting of one sentence beginning "[p]er your instructions," is opinion work product (Legal Strategy).

### Document 26

Recall from above that the Court held that CBN had waived the attorney-client privilege as to this document because it shared the information contained in it with Ralph Reed. However, CBN has also claimed opinion work product protection for this document, and, as discussed above, by simply sharing this document with Ralph Reed, CBN did not waive this document's work product protection. The Court holds that Document 26 is opinion work product in its entirety because conclusions, opinions, and legal strategies permeate the entire document.

### Document 35

The Court holds that Document 35 is opinion work product in its entirety. (Legal Strategy).

### Documents 36 and 37

Recall from above that the Court held that CBN had waived the attorney-client privilege as to this document because it shared the information contained in it with Ralph Reed. However, CBN has also claimed opinion work product protection for this document, and, as discussed above, by simply sharing this document with Ralph Reed, CBN did not waive this document's work product protection. Document 36 is a series of handwritten notes regarding C & L's opinions and strategies for dealing with CBN/TCC tax issues. Document 37 is a "to do" list that C & L generated in response to a meeting with CBN counsel. The Court holds that documents 36 and 37 are opinion work product in their entirety because conclusions, opinions, and legal strategies permeate the entire documents.

### Document 38

Document 38 is really two documents. The first two pages are handwritten notes delineating "Outstanding Items" relating to TCC. The second document consists of three pages of handwritten notes of a meeting between C & L personnel and Ralph Reed of TCC regarding the tax consequences of several TCC activities. The Court holds that the first two pages of Document 38 consist of

---

this subsection constitutes a "conclusion" within the meaning of Fed.R.Civ.P. 26(b)(3).

non-opinion work product, except as noted below:

(1) The Voter Identification bullet on the 15th line of the first page:

(a) Subparagraphs 1, 2, and 3 are opinion work product (Legal Strategy).

(2) The very last line of text on the second page:

(a) The information relating to Infocision's tax status (Legal Conclusion).

The rest of the first two pages of Document 38 consists of non-opinion work product.

The Court holds that the final three pages of Document 38 consists entirely of opinion work product because conclusions, opinions, and legal strategies permeate all three pages.

### Document 39

Document 39 is a mixture of opinion and non-opinion work product. The following is opinion work product in Document 39:

(1) Under the heading "I. CC–CBN *Common Employees* " on page one:

(a) In subparagraph B, the second (and last) sentence starting with "My concern is" and ending with "1099's." (Conclusion/Opinion).

(2) Under the heading "III. Christian Coalition Spots on *The Family Channel* " on page one:

(a) The entire subparagraph A(1), consisting of one sentence that starts "Was" and ends "time." (Legal Theory).

(3) Under the heading "IV. Christian Coalition use of *CBN Radio*" on page two:

(a) All of subparagraphs IV(A)(1)(a) and IV(A)(1)(b) on page two, including subheading that begins "PROBLEM." (Conclusions).

(b) Both sentences of subparagraph IV(A)(2) on page three that follow the heading beginning "PROBLEM WITH THIS." The first sentence starts with "A review" and the second sentence ends "air time!" (Conclusion).

(4) Under the heading "VII. *CBN Services Provided to CC* " on page 6 of document:

(a) Under the subheading "Potential Issues Remaining" on page 6 of the document:

(i) The parenthetical handwritten comment after issue (B). (Legal Conclusion).

(5) Under the heading VIII. *CBN Airplane Usage on CC Trips,* on page 6 of the document:

(a) Under "12/8/89—Orlando, Florida" section on page 6:

(i) Sentence after first semicolon starting "CBN" and ending "nature." (Conclusion).

(b) Under "4/10–11/90—Jackson, Mississippi" section on page 7:

(i) Subparagraph A in its entirety (Opinion); and

(ii) Subparagraph C in its entirety (Legal Theory).

(c) Under "6/15–16/90—Orlando, Florida" section on page 7:

(i) The second sentence in the first paragraph, starting with "Ralph mentions" and ending with "was CC." (Conclusion).

(ii) Subparagraph A in its entirety (Legal Theory).

(d) Under "6/28/90—Dallas, Texas" section on page 8:

(i) The entire Note section, starting with "There is a noticeable" and ending with "CC business." (Conclusion).

(e) Under "1/25–26/90 Washington, D.C." section on page 8:

(i) In subparagraph A, the entire phrase before the hyphen, starting with "Primary" and ending with "CBN." (Opinion/Conclusion).

(f) Under "5/11/91—Atlanta, Georgia" section on page 9:

(i) The note in subparagraph A, starting with "If Pat" and ending with "he missed." (Conclusion).

(g) "Under 11/9/91 Raleigh, North Carolina" section on page 9.

(i) Subparagraph A in its entirety, starting with "Probably" and ending with "overall cost." (Opinion).

(5) Under "Issues & To Do—CC Political Activity" on page 10:

(a) The entire Overview section on pages 10 and 11 (Opinion and Legal Analysis);

(b) The entire Section II on pages 11 and 12, carrying over to page 13 (Legal Analysis);

(c) The entire Section III on page 13 (Legal Analysis);

(d) The entire Section IV on pages 13, 14, carrying over to page 15 (Legal Analysis);

(e) The entire Section V on page 15, carrying over to page 16 (Legal Analysis);

(f) In Section VI, "Partisan Political Activity," on page 16, the initial sentence of that section, starting with "An initial review" and ending with "other campaigns." (Conclusion).

(g) In Section VI(7) in the note on page 18, in the last sentence of the Note, starting with "and apparently" and ending with "for CC." (Conclusion).

(h) In Section VI(23) on page 22, the entire sentence after subparagraph (b), starting with "In the above instances" and ending with "financial support."

### Documents 41 and 43

Recall that the Court found that CBN had waived the attorney-client privilege as to these documents by third party disclosure. However, CBN's disclosure to Ralph Reed did not waive work product protection for these documents. The Court finds that Documents 41 and 43 are opinion work product in their entirety.

### Document 44

The Court finds that document 44 merely recites a to-do list and does not contain any mental impressions, conclusions, opinions, or legal theories. Therefore, the Court holds that Document 44 is non-opinion work product in its entirety.

### Documents 45 and 46

The Court holds that both Documents 45 and 46 are opinion work product in their entirety.

### Documents 48, 52, 54, and 55

The Court finds that Documents 48, 52, 54, and 55 do not contain any mental impres-sions, conclusions, opinions, or legal theories. Therefore, the Court holds that documents 48, 52, 54, and 55 are non-opinion work product in their entirety.

### Document 53

This document is the same as Document 39 with the addition of a few marginal notes. Therefore, the Court finds that the same material that was opinion work product in Document 39 is opinion work product in document 53. Additionally, the Court classifies the handwritten marginal notes in Document 53 as opinion work product in their entirety.

### Document 61

Document 61 is a mixture of opinion and non-opinion work product. The following is the opinion work product contained in Document 61:

(a) On page two of Document 61:

(i) The fourth paragraph starting "The IRS" is opinion work product in its entirety (opinion).

(ii) The fifth paragraph starting "The IRS" is opinion work product in its entirety (opinion).

(iii) The sixth paragraph starting "Judy Liebert" is opinion work product in its entirety.

The rest of Document 61 is non-opinion work product.

### Document 63

Document 63 is a mixture of opinion and non-opinion work product. The following is the opinion work product contained in Document 63:

(a) The second paragraph, consisting of a one-sentence description of the issue. (Legal Theory).

The rest of document 63 is non-opinion work product in its entirety.

### Document 64

Document 64 consists of 4 "bullets," the first three of which simply recite facts and are not, technically, opinion work product. However, the fourth bullet is definitely opinion work product. The Court finds that redacting the fourth bullet would render the document meaningless. Additionally, the

court finds that CBN might compromise the protected opinion work product if the Court orders it to turn over a redacted copy. Therefore, the Court classifies the entire document as opinion work product.

*Document 65*

The Court finds that Document 65 is a mixture of opinion and non-opinion work product. The following is the opinion work product in document 65:

(a) The issue identified in the second paragraph of the document. (Legal Theory).

The remainder of Document 65 is non-opinion work product.

*Documents 67, 68, 69, 72, 79, 82, and 88*

Documents 67, 68, 69, 72, 79, 82, and 88 are opinion work product in their entirety.

*Document 71*

Document 71 is a mixture of opinion and non-opinion work product. It consists of a two-page letter and an invoice attached to the letter. The letter is opinion work product in its entirety. The invoice is non-opinion work product in its entirety.

*Document 73*

Document 73 is a preliminary draft of Document 71. In Document 73, however, the invoice contains handwritten marginal comments which make the invoice opinion work product. Therefore, the Court holds that Document 73 is opinion work product in its entirety.

## IV.

*Summary as to Document Classifications*

The Court has reviewed all 90 contested documents that are the subject of the FEC's subpoena. The Court holds as follows:

A. The attorney-client privilege protects documents 25, 27, 29, 30, 31, 32, 33, 34, 40, 47, 57, 58, 59, 60, 81.

B. The opinion work product doctrine of Fed.R.Civ.P. 26(b)(3) protects the following documents because they are opinion work product in their entirety: 19, 26, 35, 36, 37, 41, 43, 45, 46, 64, 67, 68, 69, 72, 73, 79, 82, 88.

C. The opinion work product doctrine of Fed.R.Civ.P. 26(b)(3) protects indicated portions the following documents because the documents contain a mix of opinion work product and non-opinion work product: 1, 2, 3, 15, 18, 20, 23, 38, 39, 53, 61, 63, 65, and 71. The non-opinion work product doctrine of Fed.R.Civ.P. 26(b)(3) protects those portions of the above documents that are not opinion work product.

D. The non-opinion work product doctrine of Fed.R.Civ.P. 26(b)(3) protects the following documents in their entirety: 7, 16, 17, 21, 22, 24, 28, 42, 44, 48, 49, 51, 52, 54, 55, 56, 62, 70, 77, 78, 84, 85, 86, 87, and 89.

E. The following documents are copies of a document previously classified in IV(A) through IV(D) above: 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 50, 66, 74, 75, 76, 80, 83, 90.

## V.

*Disclosure of Documents Protected by the Non–Opinion Work Product Doctrine of Fed.R.Civ.P. 26(b)(3)*

The Court has classified each of CBN's documents that are responsive to the FEC's subpoena as protected by either the attorney-client privilege, the opinion work product doctrine, or the non-opinion work product doctrine. However, those findings do not end this Court's inquiry.

The attorney-client privilege and the opinion work product doctrine provide protection for documents that is almost absolute; however, non-opinion work product protection is not so absolute. This Court's finding that non-opinion work product protects a document does not mean that the FEC cannot get the document. It simply means that the FEC must show this Court a substantial need for the particular document coupled with an inability to obtain the document's substantial equivalent by other means without undue hardship:

(A) party may obtain discovery of documents ... prepared in anticipation of litigation by or for another party ... only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case

and that the party is unable without undue hardship to obtain the substantial equivalent by other means.

Fed.R.Civ.P. 26(b)(3).

Therefore, in determining if the FEC can get these documents, the Court must focus on the factors of Rule 26(b)(3)'s test: (1) the FEC must show substantial need for the document; and (2) an inability to obtain the document's substantial equivalent without undue hardship.

### 1.

#### Substantial Need

■■■■■ In determining whether the FEC has demonstrated substantial need for the documents, this Court may focus on the relative importance of the documents in the underlying litigation. See 8 Charles A. Wright, Arthur R. Miller, & Richard L. Marcus, *Federal Practice and Procedure:* Civil 2d § 2025. Recall that the FEC needs these documents to impeach a defense that TCC has raised in the D.C. litigation. *See Federal Election Commission v. The Christian Coalition,* No. 2:97MC42, *Memorandum of Law and Fact In Support of the Federal Election Commission's Motion to Compel Compliance with Subpoena Duces Tecum,* § I, at 2 (E.D.Va. filed October 8, 1997). Courts have held that a party can establish substantial need for a document by showing that the document is necessary to impeachment a witness. *See, e.g., In re Grand Jury Investigation,* 599 F.2d 1224, 1233 (3d Cir. 1979) (discovery of work product allowed to test credibility of witness before the Grand Jury). Here, the FEC has shown that it needs CBN's work product to impeach a defense that TCC has raised in the D.C. litigation. It certainly is logical to extend *Grand Jury's* principle to the FEC's attempt to impeach TCC's defense in the D.C. litigation. The Court holds, therefore, that the FEC's showing that it needs CBN's non-opinion work product to impeach TCC's de-

fense in the D.C. litigation constitutes substantial need within the meaning of Fed. R.Civ.P. 26(b)(3).

Recall also that the FEC needs these documents because they bear directly on substantive issues raised in the FEC's complaint in the D.C. litigation. *See Federal Election Commission v. The Christian Coalition,* No. 2:97MC42, *Memorandum of Law and Fact In Support of the Federal Election Commission's Motion to Compel Compliance with Subpoena Duces Tecum,* § II, at 7 (E.D.Va. filed October 8, 1997). The Court has carefully reviewed the complaint that the FEC filed in the D.C. litigation. The Court agrees with the FEC that the non-opinion work product documents that C & L holds bear directly on the issues raised in the complaint concerning TCC's political and financial activity. The Court holds, therefore, that the FEC's showing that it needs CBN's work product to buttress its claims in the D.C. litigation constitutes substantial need within the meaning of Fed.R.Civ.P. 26(b)(3).

In holding the FEC has met its burden of showing substantial need, the Court did not rely solely on the FEC's showing prior to the Court's receiving the documents for *in camera* inspection. On its face, Fed.R.Civ.P. 26(b)(3) requires a "showing" before this Court can order C & L to turn the documents over to the FEC; it does not require that this Court restrict itself solely to the information proffered by the FEC in support of its motion to compel. In other words, the Court need not restrict itself in determining substantial need simply to the showing the FEC made prior to this Court's order requiring C & L to submit all 90 documents for an *in camera* inspection. This Court may also examine the documents in light of the FEC's proffered reasons for requesting them in determining if substantial need exists. *See Logan v. Commercial Union Insurance Co.,* 96 F.3d 971, 977 (7th Cir.1996).[17] *Logan* en-

---

**17.** Logan had made a claim of bad faith against Commercial in insurance litigation. To support his claim of bad faith, he requested production of documents from Commercial. Commercial claimed work product protection for the documents. The district court conducted an *in camera* inspection and found that there was no evi-

dence in the documents to support Logan's claim of bad faith. In other words, the district court supplemented Logan's preliminary showing of substantial need with its own inspection and analysis of the documents before finding that no substantial need existed. It did not restrict itself

dorsed *sub silentio* the district court's practice in that case of reviewing questioned documents *in camera* and using the knowledge gleaned from such a review to supplement the party's initial showing of substantial need.

In summary, the Court finds as a fact that all these non-opinion work product documents are highly relevant to, probative of, and may be outcome-determinative of some of the issues in the D.C. litigation.[18] Therefore, based on the FEC's showing prior to the Court's receiving the documents, and based on the Court's independent review of the documents in light of the FEC's claimed need, the Court holds that the FEC has shown a substantial need for the non-opinion work product documents within the meaning of Fed.R.Civ.P. 26(b)(3).

### 2.

### *Substantial Equivalent Without Undue Hardship*

■ In determining whether the substantial equivalent of work-product-protected information is available, courts often focus on whether the substantial equivalent of the information contained in the protected documents is available via deposition.[19] The general rule is that if work product information is available to a party via deposition, then that partyis denied production of work product containing that information in favor of obtaining the substantial equivalent through a deposition. *See, e.g., United States v. Chatham City Corp.*, 72 F.R.D. 640, 644 (S.D.Ga.1976) (denying discovery of witnesses' statements because "a substantial equivalent of witnesses' statements can be obtained by . . . deposition.") As exceptions to this general rule, however, lapses of time

between the information being recorded in the document and the litigation, forgetfulness of witnesses, or the possibility that witnesses may be hostile can lead a Court to conclude that the substantial equivalent of the work product protected document may not be available through deposition. *See, e.g., Southern Railway, Co. v. Lanham*, 403 F.2d 119 (5th Cir.1968).[20]

■ The question of whether the substantial equivalent of the material is available is a fact-specific question. Therefore, the Court will review the facts surrounding this subpoena and apply the principles discussed above. The Court first notes that the FEC has a limited availability to take depositions in the D.C. litigation. At oral argument, when the Court suggested deposing people listed in the CBN privilege document log, the FEC indicated that the D.C. trial judge had limited the number of depositions the FEC could take. See Federal Election Commission v. The Christian Coalition, No. 2:97MC42, *Transcript of Proceedings*, at 30, lines 7–8 (E.D. Va. Hearing held November 20, 1997). Though the FEC has not specifically shown how many depositions it has remaining, the Court notes that CBN's privilege log contains the names of at least 14 different individuals involved in producing these documents. To the extent that the FEC's ability to take depositions is limited, the Court holds that the FEC cannot obtain the substantial equivalent of the information contained in the protected documents via deposition. To the extent the FEC can still take depositions, the Court holds that deposing 14 separate individuals concerning the information contained in the protected documents would constitute an undue hardship.

---

simply to Logan's showing of need made before the court received the documents for inspection.

**18.** In making these findings, this Court, of course, makes absolutely no finding or expresses no opinion on the merits of those questions. That, of course, is a question for the district court in the District of Columbia. This Court simply finds, solely from the record before it, for the limited purpose of this subpoena enforcement action, and for the even more limited purpose of this substantial need analysis, that the documents meet the test of Fed.R.Civ.P. 26(b)(3).

**19.** This focus is justified in this case because this Court can think of no other way the FEC could get the information contained in these documents other than by deposing the documents' authors.

**20.** Though *Lanham* was decided in 1968, two years before the 1970 revisions to the Federal Rules of Civil Procedure that produced Rule 26, the Advisory Committee notes from the 1970 revision cite *Lanham* approvingly. *See* Fed. R.Civ.P. 26 Advisory Committee Note, 1970 Amendment, Subdivision (b)(3).

■ Furthermore, the Court notes that none of the protected documents in question postdates 1994. C & L created the vast majority of them in 1992 or earlier. Therefore, most of these documents memorialize meetings that took place at least five years ago. Even if the FEC were able to depose all the participants at these meetings, the Court doubts that the witnesses could remember the meetings with the detail that would be required to produce the substantial equivalent of the information in the protected documents. Thus, consistent with the principles of *Latham*, the Court holds that the passage of at least five years between document production and witness availability for the D.C. litigation renders depositions an unsuitable tool for the FEC to obtain the substantial equivalent of the information contained in the non-opinion work product documents.

Finally, the Court notes that, even though C & L and CBN are not technically "hostile" to the FEC in the D.C. litigation, they are hostile parties to the FEC in this subpoena enforcement action. Additionally, the documents that this Court has viewed *in camera* suggest a close working relationship between CBN and TCC which, while not sufficient to trigger the common-interest attorney-client privilege, is sufficient to make CBN hostile to the aims of the FEC's D.C. litigation against TCC. Therefore, the Court finds that it is a possibility that C & L and CBN witnesses could be hostile to the FEC in any deposition regarding the CBN/TCC relationship.

In summary, the Court finds as follows: (1) The FEC is limited in the number of depositions it may take in the D.C. litigation; and (2) at least five years have passed since the C & L/CBN meetings memorialized in the vast majority of non-opinion work product at issue in this case took place; and (3) there is a possibility that the applicable CBN and C & L employees would be hostile witnesses to any deposition inquiry by the FEC regarding these matters. The FEC has claimed, *Federal Election Commission v. The Christian Coalition*, No. 2:97MC42, *Federal Election Commission's Reply in Support of Its Motion to Compel Compliance with Subpoena Duces Tecum* at 15 (E.D.Va. filed November 6, 1997), and the Court agrees, that there is no other way for the FEC to obtain the substantial equivalent of the information contained in these documents from any other source. Accordingly, the Court holds that the FEC has met the "substantial equivalent without undue hardship" test of Fed.R.Civ.P. 26(b)(3) as it relates to the non-opinion work product subject to the FEC's subpoena. Therefore, the Court will grant the FEC's motion to compel all the non-opinion work product information contained in the documents listed in sections IV(C) and IV(D).

## VI.

For the reasons discussed in the preceding opinion, the Court:

A. DENIES the FEC's motion to compel compliance with the subpoena duces tecum issued from this Court on May 23, 1997 as to Documents 25, 27, 29, 30, 31, 32, 33, 34, 40, 47, 57, 58, 59, 60, and 81 because these documents are attorney-client privileged.

B. DENIES the FEC's motion to compel compliance with the subpoena duces tecum issued from this Court on May 23, 1997 as to Documents 19, 26, 35, 36, 37, 41, 43, 45, 46, 64, 67, 68, 69, 72, 73, 79, 82, and 88 because the opinion work product doctrine of Fed. R.Civ.P. 26(b)(3) protects these documents.

C. GRANTS the FEC's motion to compel compliance with the subpoena duces tecum issued from this Court on May 23, 1997 as to Documents 7, 16, 17, 21, 22, 24, 28, 42, 44, 48, 49, 51, 52, 54, 55, 56, 62, 70, 77, 78, 84, 85, 86, 87, and 89 because, even though the non-opinion work product doctrine of Fed. R.Civ.P. 26(b)(3) protects these documents, the Court holds that the FEC has shown a substantial need for the information contained in those documents, the substantial equivalent of which it would be unable to obtain without undue hardship.

D. GRANTS the FEC's motion to compel compliance with the subpoena duces tecum issued from this Court on May 23, 1997 as to the non-opinion work product portions of Documents 1, 2, 3, 15, 18, 20, 23, 38, 39, 53, 61, 63, 65, and 71 because the Court holds

that the FEC has shown a substantial need for the non-opinion work product information contained in those documents, the substantial equivalent of which it would be unable to obtain without undue hardship.

## VII.

### *Order*

A. The Court ORDERS C & L to deliver to the FEC no later than 10:00 a.m., EST, February 6, 1998 Documents 7, 16, 17, 21, 22, 24, 28, 42, 44, 48, 49, 51, 52, 54, 55, 56, 62, 70, 77, 78, 84, 85, 86, 87, and 89.

B. The Court ORDERS C & L to deliver to the FEC no later than 10:00 a.m., EST, February 6, 1998 Documents 1, 2, 3, 15, 18, 20, 23, 38, 39, 53, 61, 63, 65, and 71. Before delivering these documents to the FEC, C & L may redact the portions of those documents which this Court classified as opinion work product in section III(B) of this opinion.

The Court DIRECTS the Clerk to serve this Opinion and Order on January 20, 1998, on all counsel of record in this case by mailing in accordance with the provisions of Fed. R.Civ.P. 5(b).

The Court DIRECTS the Clerk to mail a courtesy copy of this Opinion and Order to the Clerk of the United States District Court for the District of Columbia.