UNITED STATES of America, Plaintiff and Counter–Defendant,

Environmental Defense, North Carolina Sierra Club, North Carolina Public Interest Research Group, Intervenor–Plaintiffs,

v.

DUKE ENERGY CORPORATION, Defendant and Counter–Claimant.

No. 1:00 CV 1262.

United States District Court, M.D. North Carolina.

April 11, 2003.

Gill P. Beck, Office of U.S. Attorney, Greensboro, NC, Daniel C. Beckhard, Katherine E. Konschnik, U.S. Department of Justice, Lois J. Schiffer, U.S. Department of Justice, Environmental & Natural Resources Div., Robert A. Kaplan, Sonja Petersen, Jason Dunn, John C. Cruden, Deborah Behles, James R. Macayeal, U.S. Department of Justice, Environmental Enforcement Sect., Washington, DC, Alan Dion, U.S. Environmental Protection Agency, Atlanta, GA, for U.S.

Daniel W. Fouts, Robert Harper Heckman, Adams, Kleemeier, Hagan, Hannah & Fouts, Greensboro, NC, Albert Diaz, Hunton & Williams, T. Thomas Cottingham, III, Nash E. Long, III, Wood W. Lay, Hunton & Williams, Charlotte, NC, Gary Stephen Rice, Duke Energy Corp., Charlotte, NC, Mark B. Bierbower, Henry V. Nickel, William F. Brownell, Makram Jaber, Hunton & Williams, Washington, DC, for Duke Energy Corp.

**384**

## *ORDER*

ELIASON, United States Magistrate Judge.

Plaintiff United States of America ("United States"), on behalf of the Environmental Protection Agency ("EPA"), has filed a motion to compel defendant Duke Energy Corporation ("Duke Energy") to produce discovery in the form of its communications with the Utility Air Regulatory Group ("UARG") and a Rule 30(b)(6) witness to testify to such communications. The UARG is a voluntary, non-profit association of electric utility companies and four trade associations.[1]

Duke Energy, in turn, has filed a cross-motion for a protective order with respect to the documents.[2] It presents several defenses to disclosure. First, it argues that the information sought by plaintiff is irrelevant to the case. It next contends that all communications between UARG attorneys and members are protected by the attorney-client privilege and work product protection. Duke Energy claims this is true even if the communications do not reflect specific Duke Energy information. (The UARG has retained the firm of Hunton & Williams as its legal advisor which, as it turns out, happens to be Duke Energy's counsel in this case.) Finally, Duke Energy contends that the above privilege and protection have not been waived because all documents generated and distributed within the UARG fall under the joint defense/common interest rule.

Plaintiff responds that Duke Energy has failed to make a particularized showing of entitlement to any privilege and protection. And, indeed, as will be seen, Duke Energy's affidavits are very conclusory and rely on a blanket assertion of privilege. In addition, plaintiff shows that Duke Energy refused to provide discovery information about the nature and membership of the UARG or information about lobbying or coordination type activities. It contends that the UARG is essentially a trade organization formed with one joint purpose, that being to influence government decision-makers.

Before addressing the issues, a brief description of this action may be helpful. Plaintiff characterizes this action as one to enforce Duke Energy's obligation to obtain permits under the Clean Air Act, 42 U.S.C. § 7401, *et seq.*, and to install the best available control technology ("BACT") with respect to eight coal-fired plants in North and South Carolina. This obligation allegedly arose because in the 1980's and 1990's, Duke Energy spent more than $3 hundred million dollars on renovations to the power plants. Plaintiff contends that the renovations constitute a major modification, triggering the permit obligation. Duke Energy counters that it was exempt from permit requirements because its renovations constitute routine maintenance, repair, and replacement under the regulations, and that the EPA's construction of the regulations to the contrary was so unexpected and radical so as to deprive Duke Energy of fair notice of the EPA's interpretation. Duke Energy indicates that there are eight similar cases pending in various district courts throughout the nation which contain similar issues.

### *Relevancy*

■ Plaintiff claims the documents are relevant because they could cast light on Duke Energy's defense that it did not receive fair notice of the EPA's interpretation of the

---

1. Plaintiff summarizes the information sought in the document requests as follows:

   Request No. 104 seeks basic information about UARG and whether there was any attorney/client relationship between Duke and UARG.

   Request No. 103 seeks documents regarding communications from UARG about the meaning of routine maintenance.

   Request No. 39 seeks information about Duke's attempts to change the law regarding routine maintenance through UARG.

   Request No. 33 seeks all assessments by UARG regarding whether projects such as those performed by Duke are routine in the industry.

   Request No. 60 seeks documents relating to communications with UARG or its members regarding Duke's permitting obligations.

   Request No. 89 seeks UARG documents about industry's understanding of routine maintenance.

   (Pl.'s Br. at 6)

2. Citing attorney-client privilege and work product protection, and any other privilege or protection, Duke Energy produced a privilege log listing 1822 documents, of which 285 are being challenged by the plaintiff. (See Pl.'s Br. Ex. A)

new source review ("NSR") regulations which allegedly apply to the projects. Duke Energy retorts that the subjective understanding of its outside counsel acting for the UARG cannot possibly show that the government provided fair notice with respect to the interpretation of the regulations at issue.

For support, Duke cites rulings from the Southern District of Illinois, *United States v. Illinois Power Company*, Civil No. 99–83–MJR, (S.D.Ill. March 7, 2002), and a case from the Southern District of Ohio, *United States v. Ohio Edison Company*, Civil No. C2–991181, 2002 WL 1585597 (S.D.Ohio July 11, 2002). (Def.'s Response Exs. A–D) Those cases are inapposite because there, the EPA argued that the utilities intended to rely on subjective evidence concerning how the regulations were understood and that this position opened discovery into any advice received by the utilities from counsel. The courts, however, rejected the argument, finding that advice of counsel had, in fact, not been interjected into the case. In a subsequent January 6, 2003 decision in the Ohio case, that court did address the issue before this Court, but the EPA did not raise the particular waiver argument it does in this case.

Before this Court, plaintiff has altered its strategy and presents alternative arguments. Plaintiff starts with the proposition that it can defeat Duke Energy's fair notice defense by showing that Duke Energy had actual notice of the interpretation, citing *United States v. Hoechst Celanese Corp.*, 128 F.3d 216 (4th Cir.1997), *cert. denied*, 524 U.S. 952, 118 S.Ct. 2367, 141 L.Ed.2d 736 (1998).

In *Hoechst*, the EPA had sent a specific interpretive letter to the defendant. The court found that the letter defeated a fair notice defense and that the letter provided actual notice of the interpretation. In making this decision, the Fourth Circuit referred to minutes from meetings convened after the receipt of the letter, which minutes unequivocally demonstrated that the defendant understood the interpretation. The EPA wants to look at the UARG communications in the hope that they will show that Duke did understand the EPA's interpretation of the regulations at issue. Plaintiff further argues that a common understanding in the industry could constitute constructive notice of the

meaning of the regulations, citing *Fluor Constructors, Inc. v. Occupational Safety and Health Review Com'n*, 861 F.2d 936, 940–42 (6th Cir.1988). Duke Energy does, at one point, state that only the language of the regulations and statements by the EPA are relevant to the issue. Yet, in the Ohio case cited by it, the court indicated that interpretations of the regulations received from third parties were discoverable. (Ohio decision, July 11, 2002) Also, in that case (December 12, 2002 opinion), it appears that the power company was going to introduce expert testimony concerning application of the regulations in the industry. Duke Energy has not revealed the particulars of its own defense and whether it is truly only relying on the language of the regulations and other public pronouncements by the EPA.

It is important to remember that the Court is not deciding the admissibility of evidence, but rather need only determine whether the proposed evidence "is relevant to the claim or defense of any party." Fed. R.Civ.P. 26(b)(1). The Court finds that discussions of the pertinent regulations by the UARG could be relevant to or lead to relevant information about the fair notice defense and whether Duke Energy had actual or constructive notice and/or understanding of the interpretation which is at issue in this case prior to or during the renovations. Consequently, it will deny Duke Energy's motion for a protective order based on relevancy.

### Attorney–Client Privilege, Work Product Protection, and the Joint Defense/Common Interest Exception to Waiver

The success of plaintiff's motion to compel will depend on whether Duke Energy prevails on its motion for a protective order. In order to obtain a protective order against disclosure of the documents, Duke Energy must show good cause.

The burden of showing good cause rests with the party requesting the protective order. The party must make a particular request and a specific demonstration of facts in support of the request as opposed to conclusory or speculative statements about the need for a protective order and

the harm which would be suffered without one.

*Brittain v. Stroh Brewery Co.,* 136 F.R.D. 408, 412 (M.D.N.C.1991). The specificity requirement furthers the goal that the Court only grant a protective order as narrow as is necessary under the facts. *Id.*

In the instant case, Duke Energy claims the documents are protected by attorney-client privilege or work product protection, or both. Because this Court's jurisdiction over this case arises from federal law claims, the Court will apply federal law in defining the scope of attorney-client privilege as well as any work product protection. *Mason C. Day Excavating, Inc. v. Lumbermens Mut. Cas. Co.,* 143 F.R.D. 601, 605, 607 (M.D.N.C. 1992).

The EPA contends that the documents generated by the UARG cannot be privileged or protected material with respect to Duke Energy because the documents were not created in confidence, but were shared with other people. In addition, it argues that the disclosure of the information waives the privilege or protection. Duke Energy, on the other hand, contends that the documents were created in confidence and, in any event, sharing did not waive the privilege or protection because of the joint defense/common interest rule.

The elements necessary for creating privileged attorney-client communications have, as a requirement, that the communication be made outside the presence of strangers.[3] Work product immunity does not explicitly require that the documents be created in confidence.[4] This difference has led to slightly different treatment of the attorney-client privilege and work product protection when documents are shared with third parties. This difference has been summarized by the Third Circuit in *Westinghouse Elec. Corp. v. Republic of Philippines,* 951 F.2d 1414, 1427–28 (3d Cir.1991), as follows:

> The purpose of the work-product doctrine differs from that of the attorney-client privilege. See, for example, Stephen A. Saltzburg, *Corporate and Related Attorney–Client Privilege Claims: A Suggested Approach,* 12 Hofstra L.Rev. 279, 303 n. 121 (1984); Willcox, 49 Md.L.Rev. at 922–23. As we have explained, the attorney-client privilege promotes the attorney-client relationship, and, indirectly, the functioning of our legal system, by protecting the confidentiality of communications between clients and their attorneys. In contrast, the work-product doctrine promotes the adversary system directly by protecting the confidentiality of papers prepared by or on behalf of attorneys in anticipation of litigation. Protecting attorneys' work product promotes the adversary system by enabling attorneys to prepare cases without fear that their work product will be used against their clients. *Hickman v. Taylor,* 329 U.S. 495, 510–11, 67 S.Ct. 385, 393–94, 91 L.Ed. 451 (1947); *United States v. AT & T,* 642 F.2d 1285, 1299 (D.C.Cir.1980).
>
> *Shoe Machinery Corp.,* 89 F.Supp. 357, 358–59 (D.Mass.1950)), *cert. denied,* 480 U.S. 938, 107 S.Ct. 1585, 94 L.Ed.2d 775 (1987).

*In re Allen,* 106 F.3d 582, 600 (4th Cir.1997), *cert. denied,* 522 U.S. 1047, 118 S.Ct. 689, 139 L.Ed.2d 635 (1998).

---

**3.** The Fourth Circuit requires the following showing for a communication to be entitled to attorney-client privilege:

(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*United States v. Tedder,* 801 F.2d 1437, 1442 (4th Cir.1986)(quoting *United States v. United*

**4.** In order to come within the qualified immunity from discovery created by Rule 26(b)(3) three tests must be satisfied. The material must be:

1. "documents and tangible things;"
2. "prepared in anticipation of litigation or for trial;" and
3. "by or for another party or by or for that other party's representative."

8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2024 at 336 (2nd ed.1994) (footnote omitted).

A disclosure to a third party waives the attorney-client privilege unless the disclosure is necessary to further the goal of enabling the client to seek informed legal assistance. Because the work-product doctrine serves instead to protect an attorney's work product from falling into the hands of an adversary, a disclosure to a third party does not necessarily waive the protection of the work-product doctrine. Most courts hold that to waive the protection of the work-product doctrine, the disclosure must enable an adversary to gain access to the information. See, for example, *AT & T*, 642 F.2d at 1299. See also 8 *Charles Alan Wright Arthur R. Miller & Richard L. Marcus*, § 2024 at 210 (citing cases).

Thus, work product enjoys greater protection against waiver than attorney-client privileged communications. In fact, as will be discussed later, work product may even be more protected against waiver than attorney-client documents protected by the joint defense/common interest rule. For now, the Court will analyze the joint defense/common interest rule with respect to those documents for which only the attorney-client privilege was invoked.

Plaintiff only seeks UARG documents when individuals, in addition to Duke Energy, were given them. This raises a question as to whether the documents would be entitled to attorney-client privilege in the first instance, and, if so, whether any privilege has been waived by sharing. *Federal Election Com'n v. Christian Coalition*, 178 F.R.D. 61, 73 (E.D.Va.), *aff'd with modifications*, 178 F.R.D. 456 (E.D.Va.1998). Duke Energy first states the documents were created in confidence because the Court should treat the UARG as if it were a corporation so that all communications among members would be as between officers of a corporation. It advances no authority supporting this proposition, and the Court rejects the contention.

Defendant next asserts that the UARG documents fall within the joint defense/common interest rule. For this argument, defendant cites cases from a number of circuits, as well as district court cases. These cases are not in agreement on all essentials of this purported rule. See *United States v. Weissman*, 1996 WL 737042 (S.D.N.Y. Dec.26, 1996)(collecting cases), *and* Paul R. Rice, *Attorney–Client Privilege in the United States* § 4.36 (2nd ed.1999). Importantly, defendant has not cited a Supreme Court case which has recognized this rule. The Fourth Circuit, however, has issued several opinions. See *Sheet Metal Workers Intern. Ass'n v. Sweeney*, 29 F.3d 120 (4th Cir.1994)(individual), *and In re Grand Jury Subpoenas, 89–3 and 89–4, John Doe 89–129*, 902 F.2d 244 (4th Cir.1990)(corporation and a former subsidiary).

In *In re Grand Jury Subpoenas*, the Fourth Circuit recognized that the concept of a joint defense/common interest rule first arose in a criminal law context and has since been expanded by a number of courts.[5] The Fourth Circuit defined the rule as follows:

> Whether an action is ongoing or contemplated, whether the jointly interested persons are defendants or plaintiffs, and whether the litigation or potential litigation is civil or criminal, the rationale for the joint defense rule remains unchanged: persons who share a common interest in litigation should be able to communicate with their respective attorneys and with each other to more effectively prosecute or defend their claims.

902 F.2d at 249. It further held that the joint defense/common interest rule was an exception to the waiver rule and, therefore, encompassed not only the attorney-client privilege, but also work product protection. *Id.* Once privilege is established under the rule, a waiver may not occur without consent of all parties who share the privilege. *Id.* at 250.

---

**5.** One commentator has indicated that the term "joint defense privilege" lumps together and mangles two separate concepts, one being "the allied lawyer doctrine" and the other the "joint client doctrine." 24 Charles Alan Wright & Kenneth W. Graham, *Federal Practice and Procedure* § 5493 (1986 Supp.2003). The "allied lawyer doctrine" applies when parties with separate lawyers consult, whereas the "joint client doctrine" applies when two clients share the same lawyer. *Id.* The commentator further criticizes the apparent attempt to create a separate privilege called the "common interest privilege."

While the Fourth Circuit in *In re Grand Jury Subpoenas*, 902 F.2d 244, did recognize the joint defense/common interest rule, it did so where the facts showed an actual agreement to prosecute claims. Further, as noted by the court in *Federal Election Com'n*, 178 F.R.D. at 73, the cases cited by the court in *In re Grand Jury Subpoenas* were ones where the parties were involved in some type of litigation. The other Fourth Circuit case discussing the joint defense/common interest rule is *Sheet Metal Workers*, 29 F.3d 120. There, the court upheld a finding of no joint privilege in the context of a criminal investigation. Consequently, neither case shows that the Fourth Circuit has adopted a broad, new privilege such as that advocated by Duke Energy in the instant case where the sharing was not done by agreement relating to some shared actual or imminent, specific litigation. In attempting to predict how the Supreme Court and Fourth Circuit would rule on the specific issue presented here, the Court must heed the Supreme Court's admonition to recognize or expand new privileges with caution and make sure the privilege promotes sufficiently important interests to offset the loss of probative evidence. *Westinghouse Elec.*, 951 F.2d at 1425 (collecting cases).

One treatise which examines the allied lawyer or joint client doctrine points out that the allied lawyer privilege appeared to be first recognized in 1871 in a state criminal case and lay dormant for nearly a century with only recent growing support in court decisions. 24 Wright & Graham, *supra* § 5493. It notes that the main push for expansion of the privilege appears to come from corporate lawyers, in particular, to help them in antitrust matters. *Id.* It adds that, "no one has ever made a convincing argument that strategy sessions among co-defendants produce a benefit to the legal system that outweighs the cost of the loss of evidence to the courts." *Id.*

Yet, it has been suggested that collaborative efforts by parties with common interest may encourage better case preparation and reduce time and expense, although this only leaves the "crime-fraud exception to the priv-ilege ... as a check against the use of pooling arrangements for illegitimate purposes." 2 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 188 (2d ed.) These authors point out that Uniform Rule of Evidence 502(b)(3) requires that there be an actual pending action before the pooled defense privilege may be utilized. *Id.* This serves to restrict expansion of the privilege to situations where the benefit and the necessity are at their highest, and to restrict the opportunity for misuse.

In sum, there does not appear to be a pressing societal need for the extension of a joint defense/common interest rule. Consequently, the Fourth Circuit would likely proceed cautiously in this area, as did the Fifth Circuit in *In re Santa Fe Intern. Corp.*, 272 F.3d 705 (5th Cir.2001). That case involved a class action by offshore drilling workers against a number of offshore drilling corporations which had engaged in secret "joint defense" meetings. In-house counsel shared documents with other corporations and these documents were sought by the plaintiffs. The court denied application of a joint defense privilege because there was not a "palpable threat of litigation." *Id.* at 711. It found the documents, generated nine years prior to the institution of litigation, were not created in anticipation of future litigation, but to ensure compliance with antitrust laws and other legal purposes.

■ It is concluded that in order for the attorney-client privilege to be expanded by the joint defense/common interest rule, Duke Energy must show an agreement among all members of the UARG to share information as a result of a common legal interest relating to ongoing or contemplated litigation.[6] This expansion only applies to the exchange of information which falls within the agreed shared interest. *In re Grand Jury Subpoenas*, 902 F.2d at 249; *In re Santa Fe Intern. Corp.*, 272 F.3d 705, 711 (5th Cir.2001). Contemplated litigation means a palpable threat of litigation. A palpable threat of litigation, in turn, would seem to be at least as strin-

---

**6.** There is a question as to whether the litigation interests have to be identical. *See* 2 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evi-dence* § 188 (2d ed.). However, it will not be necessary to resolve that issue in the instant case.

gent as the anticipation of litigation standard used for work product in Rule 26(b)(3).

The Court now turns its attention to the documents for which work product protection is claimed. As noted earlier, the Fourth Circuit includes work product protected documents as being within the expanded protection provided by the joint defense/common interest rule. However, it was also noted previously that work product, unlike the attorney-client privilege, is not waived merely upon the disclosure of documents to third parties. As explained by the Third Circuit in *Westinghouse Elec.*, 951 F.2d 1414, disclosure to a non-adversarial third party may well not amount to a waiver. It is not entirely clear whether that means that work product disclosed to third parties enjoys greater protection against waiver than confidential attorney-client communications protected by the joint defense/common interest rule. It may be that the standards are co-extensive. *See Medinol Ltd. v. Boston Scientific Corp.*, 214 F.R.D. 113 (S.D.N.Y.2002) (No. 01 Civ. 2881(AKH)) (waiver of work product unless disclosure limited to those with common litigation interest). The Third Circuit in *Westinghouse Elec.*, 951 F.2d 1414, would appear to expand work product protection and permit disclosure of work product to any non-adversarial third party. In part, it rested its decision on the Fourth Circuit case of *In re Doe*, 662 F.2d 1073 (4th Cir.1981), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982). There, the Fourth Circuit said work product was protected from forfeiture unless it was shown that the disclosure occurred in a situation where "the attorney cannot reasonably expect to limit future use of the otherwise protected material." 662 F.2d at 1081. However, that case involved an inadvertent disclosure, and it is not clear whether the standard for protecting work product documents against waiver would be higher where a disclosure is intentionally made, as in the instant case.[7]

Here, the disclosure of documents by the UARG to and by its members likely has been to non-adversaries, and if the *In re Doe*

standard is used, the documents would retain their protection, nothing else appearing. However, as will be seen, the Court need not resolve the issue because both work product and the joint defense/common interest rule require that the documents be created in anticipation of litigation. On this issue, Duke Energy fails to submit non-conclusory evidence to support its assertions. The Court will now discuss the evidence.

### *Evidence and Discussion*

■ Duke Energy purports to establish entitlement to its claims of privilege and protection with conclusory assertions in affidavits. The affidavit of Kris W. Knudsen states that Duke Energy has been a member of the UARG since 1980. He is a senior technical consultant and has attended numerous meetings. He describes the UARG as a voluntary, non-profit association of electrical companies and four trade associations "formed to advance the common legal interests of its members in matters pertaining to air quality regulation by participating in administrative and judicial proceedings concerning the Clean Air Act." (Knudsen Decl. at 1–2) The UARG's attorneys in the Hunton & Williams law firm have issued memoranda allegedly conveying legal advice sought by request of the UARG's members. The UARG requires that attorney communications be privileged and confidential, and that the members must so agree. (It does not appear the EPA challenges this last assertion.)

John Holloway, an attorney for Hunton & Williams, submits an affidavit wherein he states that the law firm is the legal advisor to the UARG and that the documents were created in the course of the firm's representation of the UARG in administrative rulemaking proceedings and associated litigation. He admits that some documents were sent to parties who were not members of the UARG, but makes the claim that these are entities "sharing common interests with UARG and its members." (Holloway Decl. at 2) He does

---

7. Requiring intentional sharers to satisfy the joint defense/common interest rule has some advantage. It serves to narrow the protection and ensure it is only applied to situations where there is a recognized need to share. The joint defense/common interest rule is a specific and premeditated one. It provides clearer guidance to parties who are in or who anticipate litigation, and it is easier for the courts to apply.

not identify these non-members, nor any specific common litigation interest. He further states that the UARG refused to provide membership and organization lists to the EPA because it made an alternative production, but only to the extent this information was available. Finally, Holloway asserts that all UARG communications regarding rulemaking are privileged because "almost every EPA rulemaking under the Clean Air Act results in a judicial challenge."

Duke Energy also submits the declaration of a Jeffrey Cherry, another lawyer with Hunton & Williams. He merely makes the conclusory observation that, in his opinion, all UARG documents resulted from attorney-client communications and work product. With respect to work product, he does not define any specific litigation.

In its motion to compel, the United States cites evidence that most representatives attending meetings are technical, non-legal staff. Some are non-members. It produced one 1989 UARG memo which provides general information about the applicability of the requirements of the Clean Air Act with respect to modifications and, in particular, the effect of the Wisconsin Power Company (Wepco) case [8] on the utility industry. (Pl.'s Br. Ex. 4) (Plaintiff argues that this memo shows that the UARG clearly understood the EPA's interpretation of the regulations and communicated this understanding to the membership.)

Plaintiff also takes issue with Knudsen's allegation that the UARG does not engage in lobbying activities. It points out that Duke Energy's privilege log "is filled with entries evidencing attempts to change regulatory requirements." (Pl.'s Br. at 7) Such activity coordinating opposition is much like that which the Court in *North Carolina Elec. Membership Corp. v. Carolina Power & Light Co.,* 110 F.R.D. 511 (M.D.N.C.1986), found to be lobbying. Plaintiff also cites letters from UARG counsel to the Chief of Staff and administrators of the Department of Energy or Environmental Protection Agency explaining the practical problems that the Wepco decision has created. (Pl.'s Br. Exs. 13 & 15) It cites to one document which states that the EPA will be asking the

Office of Management and Budget for permission to survey and evaluate all maintenance done at power plants in the last several years and that the UARG will oppose this. (Pl.Br.Ex. 17) A UARG recruitment letter states that the UARG seeks to achieve its goals through the rulemaking process and in subsequent litigation. (Def.'s Reply Ex. A) Yet, the letter also says the UARG keeps members up to date and conducts workshops to discuss the impact of rules. Moreover, it cites the need for electric utilities to become members because otherwise, a company's specific problems will not be addressed. It points out that the UARG conducts studies to reduce the "scope and impact of further EPA rules."

The Court finds that Duke Energy's evidence fails to show that it is entitled to the joint defense/common interest rule with respect to UARG documents. It has also failed to establish that the documents are work product. In effect, Duke Energy argues that whenever a business group bands together for a common purpose of making their will known to government regulators, all attorney communication to the group is privileged and/or work product. This appears to be a drastic expansion of the law of privilege and work product protection.

Duke Energy has failed to show that the UARG and all of its members have any common litigation interest with respect to a specific litigation or anticipated litigation or, in other words, to "an actual claim or a potential claim following an actual event or series of events that reasonably could result in litigation." *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Murray Sheet Metal Co., Inc.,* 967 F.2d 980, 984 (4th Cir.1992). This is required for work product protection and, as the Court now holds, to be able to utilize the joint defense/common interest rule.

Duke Energy has not shown that the UARG members have agreed to proceed together to prosecute or defend a shared, specific litigation interest. Duke Energy does not identify a specific litigation or threat of litigation.

8.  *Wisconsin Elec. Power Co. v. Reilly,* 893 F.2d 901 (7th Cir.1990).

There is no evidence that counsel for Duke Energy and the UARG appear as co-counsel in litigation or that the UARG represents Duke Energy and the other members in any binding sort of way. If the UARG initiates litigation, this has not been documented, nor whether its members are independently involved. Duke Energy does state that the UARG is not involved in any of the underlying litigation.

In addition to not identifying specific litigation or a palpable litigation threat, Duke Energy has not shown the requisite common interest. In the first place, it is unlikely that the power companies always speak with one voice in the face of every decision issued by the EPA. The evidence shows that power companies face different problems and that the purpose of the UARG is for them to band together to present a united front to the EPA. This does not seem to be a legitimate purpose for using the joint defense/common interest rule.

That the common interest is really a business, not a litigation, interest is shown by the fact that the UARG includes trade associations and the information is sometimes distributed to non-members. The attendees are technical people, not legal personnel who could coordinate a specific legal effort. This further shows the nature of the UARG does not meet the requirements of the joint defense/common interest rule. Instead, the evidence shows that the UARG is a loose association of power companies and trade groups which has a strong component of lobbying. For the most part, is disperses general information and legal advice, in the form of interpretations of regulations, court decisions, etc. to its members. It does not appear to make actual applications to a client who has sought representation and has presented specific facts in regard to a palpable legal problem. *North Carolina Elec.,* 110 F.R.D. at 517. Finally, there is no showing that the advice in the withheld documents arose from a specific shared litigation agreement. The fact that the UARG members must agree to keep matters in confidence does not show agreement at to any specific litigation stance.

In summary, the UARG appears to be a trade association/lobbying group *which at times* perhaps engages in litigation, but no specific litigation has been identified for the documents at issue. Also, Duke Energy does not show that the UARG members vote or otherwise agree to take a specific litigation stance. Nor has Duke Energy shown that the communications were only with respect to the agreed common shared litigation interest. It was incumbent upon Duke Energy to come forward with specific facts showing these matters. Conclusory statements and ambiguous evidence will not satisfy that burden. *Sheet Metal Workers,* 29 F.3d at 125; *Pete Rinaldi's Fast Foods v. Great American Ins. Companies,* 123 F.R.D. 198, 203 (M.D.N.C.1988); *Baltimore Scrap Corp. v. David J. Joseph Co.,* Civ. No. L–96–827, 1996 WL 720785 (D.Md. Nov.20, 1996) (ambiguous evidence).

For these reasons, the Court rejects Duke Energy's claims of joint defense/common interest rule, attorney-client privilege and work product protection claims with respect to the disputed documents, grants plaintiff's motion to compel, and denies defendant's cross-motion for a protective order prohibiting disclosure of these documents.

**IT IS THEREFORE ORDERED** that plaintiff's motion to compel discovery regarding UARG documents (docket no. 82) is granted and the documents shall be provided, along with a Rule 30(b)(6) deponent to testify concerning these documents.

**IT IS FURTHER ORDERED** that defendant's motion for a protective order (docket no. 114) against revealing any UARG documents be, and the same hereby is, denied.