SCR-Tech LLC v. Evonik Energy Servs., LLC, 2013 NCBC 42.

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
08 CVS 16632

SCR-TECH LLC,

        Plaintiff,

    v.

EVONIK ENERGY SERVICES LLC,
EVONIK ENERGY SERVICES
GMBH, EVONIK STEAG GMBH,
HANS-ULRICH HARTENSTEIN, and
BRIGITTE HARTENSTEIN,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER ON DEFENDANTS'
MOTION TO COMPEL**

{1}     THIS MATTER is before the court on Defendants' Motion to Compel ("Motion") production of several pieces of correspondence between SCR-Tech and Frank Ebinger, Ebinger Katalysatorservice GmbH & Co. KG, Envica GmbH n/k/a Ebinger GmbH, Ebinger Kat GmbH/Envica Kat GmbH, and/or Ebinger Verwaltungs GmbH (collectively referred to as "Ebinger"), and between SCR-Tech and Catalytica Energy Systems, Inc. ("Catalytica"), which SCR-Tech has withheld on the basis that they are protected by the attorney-client privilege. After a particularized fact inquiry, for the reasons stated below, Defendants' Motion is GRANTED in part and DENIED in part.

> *King & Spalding LLP, by Timothy G. Barber, Antonio E. Lewis, David Glen Guidry, and Mary Katherine Bates for Plaintiff SCR-Tech, LLC.*
>
> *K&L Gates, LLP by Samuel T. Reaves, and Hamilton Martens Ballou & Carroll, LLC by Beverly A. Carroll for Defendants Steag Energy Services, LLC, Hans-Ulrich Hartenstein, and Brigitte Hartenstein.*

*Bryan Cave, LLP by Mark Vasco, Benjamin F. Sidbury, and Christina Davidson Trimmer for Defendants Steag Energy Services GmbH and Steag GmbH.*

Gale, Judge.

## I.    INTRODUCTION

{2}    Ebinger, or its predecessor, had a direct or indirect ownership in SCR-Tech until February 23, 2004, when SCR-Tech was sold to Catalytica.  Later, when Ebinger no longer had any ownership in SCR-Tech, Ebinger and SCR-Tech were adverse to Defendants in separate litigation.  As to the current litigation pending before this court, Ebinger also entered into a Cooperation Agreement offering support to SCR-Tech in prosecuting its claims.  By their Motion filed on April 12, 2013, Defendants seek three separate categories of communications which they contend are not covered by the attorney-client privilege: (1) approximately 85 communications between SCR-Tech and Ebinger created between 2001 and February 23, 2004; (2) approximately 5 communications between SCR-Tech and Catalytica created after February 23, 2004, but before litigation was anticipated; and (3) approximately 24 communications between SCR-Tech and Ebinger created after December 2010, that SCR-Tech contends were created after SCR-Tech and Ebinger were both engaged in litigation with Defendants and when they shared a common legal interest.

{3}    While the Motion was pending, on July 17, 2013, Defendants informed the court by letter that SCR-Tech had produced a supplemental privilege log on June 28, 2013, listing an additional 112 pieces of correspondence it had discovered between SCR-Tech and Ebinger, and being withheld pursuant to the common-interest doctrine.  Some documents were produced, but claimed privileged communications were redacted.

{4}    The court will address these three categories of documents separately. In doing so, the court will only discuss those facts and procedural background necessary for the determination of the present Motion.  Additional factual and

procedural background can be found in this court's July 22, 2011 Order and Opinion. Defendants' challenge is not that the subject matter of the communications was not proper for the assertion of a privilege, but rather that no privilege exists in the first instance. Alternatively, as to the third category of documents, Defendants urge that any privilege has been waived by the earlier production of documents governed by the same privilege.

## II.    ANALYSIS

A.    <u>Communications Between SCR-Tech and Ebinger Between 2001 and February 23, 2004</u>

{5}    SCR-Tech alleges that the communications between SCR-Tech and Ebinger from 2001 until Catalytica acquired SCR-Tech on February 23, 2004 all contain legal advice and discussion between SCR-Tech, Ebinger, and counsel relating to negotiations with Catalytica regarding Catalytica's purchase of SCR-Tech. SCR-Tech contends that these communications are covered by the attorney-client privilege, and that the privilege was not destroyed because the communications were shared between Ebinger and SCR-Tech, but instead remain privileged because Ebinger was SCR-Tech's parent company during this time period and because SCR-Tech and Ebinger shared a common legal interest.

{6}    As an initial matter, Defendants contend that Ebinger could never qualify as SCR-Tech's "parent" because it was never a majority owner. The record indicates that from 2001 through 2003, SCR-Tech was owned solely by SCR-Tech GmbH, which in turn was owned in part (37.5%) by Envica Kat, a predecessor to Ebinger. (Opening Br. in Supp. of Defs.' Mot. to Compel Ebinger/Envica Docs. on Privilege Log 5; Reply in Supp. of Defs.' Mot. to Compel Ebinger/Envica Docs. on Privilege Log 3.) From 2003 through February 23, 2004, SCR-Tech was jointly owned by SCR-Tech GmbH and EnBW Energy Solutions GmbH. (Opening Br. in Supp. of Defs.' Mot. to Compel Ebinger/Envica Ds. on Privilege Log 5.) Defendants urge the court to determine that, for purposes of the attorney-client privilege, a

"parent" is one who owns a "controlling interest" in the subsidiary, requiring an ownership of more than 50%. (Opening Br. in Supp. of Defs.' Mot. to Compel Ebinger/Envica Ds. on Privilege Log 6; Reply in Supp. of Defs.' Mot. to Compel Ebinger/Envica Ds. on Privilege Log 3.)

{7}     SCR-Tech instead contends that a "parent" need not own a direct, controlling interest in a subsidiary to come within the privilege. (Pl. SCR-Tech LLC's Reply in Opp'n to Defs.' Mot. to Compel the Produc. of Privileged Rs. 3.) It further contends that the documents, which involve discussions between SCR-Tech's owners and its legal counsel about the sale of SCR-Tech, demonstrate that Ebinger and the other owners exercised control over SCR-Tech in negotiating SCR-Tech's sale. (Pl. SCR-Tech, LLC's Supplemental Mem. of Law in Opp'n to Defs.' Mot. to Compel the Produc. of Privileged Rs. 6; Pl. SCR-Tech LLC's Reply in Opp'n to Defs.' Mot. to Compel the Produc. of Privileged Rs. 4.) Ebinger's participation in these "confidential, strategic, legal communications," SCR-Tech contends, "underscores their common legal interest with SCR-Tech." (Pl. SCR-Tech LLC's Reply in Opp'n to Defs.' Mot. to Compel the Produc. of Privileged Rs. 4.)

{8}     The court is not aware of North Carolina precedent which addresses either how to define a "parent" for purposes of applying the attorney-client privilege to "joint clients," or the relevance that the extent of shared ownership plays when examining a common interest privilege. The court has then considered other authorities.

{9}     The Fourth Circuit has noted that "a number of courts have held that close corporate affiliation, including that shared by a parent and a subsidiary, suffices to render those entities 'joint clients' or 'co-clients,' such that they may assert joint privilege in communications with an attorney pertaining to matters of common interest." *United States v. Under Seal # 4 (In re Grand Jury Subpoena # 06-1)*, 274 Fed. App'x 306, 311 (4th Cir. 2008) (citing *Glidden Co. v. Jandernoa*, 173 F.R.D. 459 (W.D. Mich. 1997)). The Restatement of the Law Governing Lawyers § 73 provides:

When a client is a corporation . . . or other for-profit or not-for-profit organization, the attorney-client privilege extends to a communication that:

> (1) otherwise qualifies as privileged under §§ 68 – 72;
> (2) is between an agent of the organization and a privileged person as defined in § 70;
> (3) concerns a legal matter of interest to the organization; and
> (4) is disclosed only to:
> > (a) privileged persons as defined in § 70; and
> > (b) other agents of the organization who reasonably need to know of the communication in order to act for the organization.

Restatement (Third) of the Law Governing Lawyers § 73 (2000). Comment (d) to § 73 states "when a parent corporation owns controlling interest in a corporate subsidiary, the parent corporation's agents who are responsible for legal matters of the subsidiary are considered agents of the subsidiary." Restatement (Third) of the Law Governing Lawyers § 73 cmt. d (2000).

{10} The United States District Court for the District of Columbia faced a situation similar to the present one in *United States v. American Telephone & Telegraph Co.*, 86 F.R.D. 603, 616 (D.C. Cir. 1979), and stated:

> The cases clearly hold that a corporate "client" includes not only the corporation by whom the attorney is employed or retained, but also parent, subsidiary, and affiliate corporations. We found no cases in which there was a consideration of the degree of ownership required to give rise to the parent, subsidiary, or affiliate relationship. The cases in which the issue has arisen as to the identity of the client also involved facts in which the two related corporations had a substantial identity of legal interest in the matter in controversy. In such circumstances, notwithstanding that the corporations were distinct, the representation by the attorney was common or joint representation and hence the communications among them were still covered by the attorney-client privilege. If the claimant of the privilege can show a substantial identity of legal interest in the specific matter, it therefore makes no difference whether the two corporations were so affiliated as to be a single "client." But if there is no such community of interest in seeking advice, for example when the matter is transmitted simply for information, the question of closeness of affiliation may arise.

*Am. Tel. & Tel. Co.*, 86 F.R.D. at 616. There, both parties apparently agreed that the wholly-owned and majority-owned affiliates of AT&T shared significant affiliation so as to be considered as one "client" with AT&T. *Id.* They disagreed whether companies in which AT&T was only a minority owner (with AT&T owning no more than a 30% interest) were also "clients." AT&T argued that those subsidiaries should be also be considered "one client" with AT&T, and "that to distinguish between member corporations on the basis of percentage of ownership exalts form over substance." *Am. Tel. & Tel. Co.*, 86 F.R.D. at 616–17. The court rejected AT&T's argument, and held that those subsidiaries were to be considered as separate entities from AT&T, but that those subsidiaries might nevertheless be considered a "joint client" with AT&T "in particular matters with respect to which they had a substantial identity of legal interest with AT&T." *Am. Tel. & Tel. Co.*, 86 F.R.D. at 616–17. As the degree of corporate interest declined, the importance of a common legal interest increased. SCR-Tech similarly contends that arbitrarily precluding a "joint client" privilege solely on the basis of the degree of ownership "elevates corporate form over the legal substance of the corporate relationships." *See* (Pl. SCR-Tech LLC's Reply in Opp'n to Defs.' Mot. to Compel the Produc. of Privileged Rs. 3.)

{11} Cases have not allowed the attorney-client privilege to be sustained solely on an assertion that there is some common corporate affiliation, without more. Citing *American Telephone & Telegraph*, the District Court for the District of New Hampshire held on the facts of that case that the attorney-client privilege was waived when an attorney for one corporate entity shared a document with the corporation's "affiliate," because:

> . . . even assuming that related corporate entities (e.g., parent corporation and subsidiary) may share legal documents without waiving any attorney-client privilege attached to those documents, [the corporation's] assertion that [the affiliate] was, at the time, one of its "affiliates" is simply insufficient to carry its burden. . . . [The corporation did] not, for example, provide evidence showing that, at the time of [the disclosure], [the corporation] owned a controlling amount

> of [the affiliate's] stock or that a controlling interest in both [the subsidiary] and [the corporation] was held by a third entity.
>
> …
>
> And, importantly, [the corporation] has not pointed to any legal authority suggesting that documents may be passed between parties with such an attenuated relationship without waiving the attorney-client privilege; it has not, for example, developed in any meaningful way the claim that [the corporation] and [the affiliate] shared a sufficient "identity of legal interest" to warrant application of the attorney-client privilege.

*Moore v. Medeva Pharms., Inc.*, 2003 U.S. Dist. LEXIS 5960, at *9–12 (D. N.H. Apr. 9, 2003).

{12}     The various authorities often interchangeably refer to the "joint client" (sometimes referred to as "single client") privilege and the "common interest" doctrines without noting the analytical difference between them.  The "joint client" privilege focuses on client identity as defined by the extent of corporate relationship between two entities.  The "common-interest" doctrine depends more on common legal interests between the separate entities, although the fact of corporate affiliation between them can factor into the analysis of that common legal interest. The common-interest doctrine has arisen by expanding the joint-defense doctrine in criminal law, which was not controlled by any ownership relationship.  *See generally Teleglobe USA, Inc. v. BCE Inc. (In re Teleglobe Commc'ns Corp.)*, 493 F.3d 345 (3rd Cir. 2007) (describing the origins of and the differences between the co-client privilege and the common-interest privilege, and how those doctrines apply in the parent-subsidiary context).  The common-interest doctrine is based in part on the practicality of permitting parties who share an identical legal interest to share documents and strategy helpful to pursuing that legal interest.  *See id.* at 363–64.[1]

{13}     SCR-Tech's position draws from both the "joint client" and "common-interest" privileges.  In considering the parent-subsidiary extension of the attorney-client privilege, the court considers whether the parent and subsidiary are sufficiently united such that they may properly be considered joint clients.  If the

---

[1] The court here does not intend to set rigid parameters for applying the common-interest doctrine, and this Order must be read in the context of the particular facts of this case.

degree of common ownership is sufficient to evidence control as to the subject matter of the communications (*e.g.* one is wholly owned by the other or both are wholly owned by a third party, and share legal counsel), generally, the two corporations will each be considered "clients" for purposes of the privilege. *See generally Teleglobe USA, Inc.*, 493 F.3d at 370–72. If this test is met, the court need not further identify an identical legal interest and a joint strategy to pursue that specific legal interest. On the other hand, if the corporate affiliation does not rise to that level, the court still considers the nature of the affiliation, but does so as a part of determining whether a common interest privilege exists because of the commonality of the legal interest represented by the communications. *See id.* at 366–67 (explaining the differing treatment of wholly-owned and partially-owned subsidiaries).

{14} Here, the court notes that there is both a corporate affiliation and, at least before 2004, a shared legal interest, which in combination renders the communications privileged. *See Polycast Tech. Corp. v. Uniroyal, Inc.*, 125 F.R.D. 47, 49–50 (S.D.N.Y. 1989). In *Polycast*, the plaintiff ("Polycast") purchased a wholly-owned subsidiary ("Plastics") of the defendant ("Uniroyal"). *Id.* at *48. Polycast later sued Uniroyal for alleged misrepresentations made during the negotiations for the sale of Plastics. *Id.* Relevant to the present dispute, Polycast sought communications between Weber, the Vice President and General Manager of Plastics, and Elton, the General Counsel for Uniroyal. *Id.* at *48–49. The court first held that the attorney-client privilege applied to the communications because Weber was seeking legal advice from Elton regarding the disclosures that needed to be made to Polycast in anticipation of the sale. *Id.* at *49. The court then held that "Uniroyal and Plastics had a mutual, rather than separate, interest in the legal advice supplied by Elton." *Id.* at *50. Lastly, the court held that, "[w]here corporations have a common legal cause or identity of interest in a matter discussed with an attorney, a joint privilege attaches to the discussion." *Id.* at *50; *see also ClubCom, LLC v. Captive Media, Inc.*, 2009 U.S. Dist. LEXIS 55651, at *5–6 (W.D. Pa. June 30, 2009) (finding that the disputed email chains between general counsel

and the former executive officer of a corporate affiliate of plaintiff corporation, "which relate to the negotiation and wording of legal contracts, as opposed to mere business or factual information" were covered by the attorney-client privilege because the general counsel "was acting in a legal rather than business capacity," and that the privilege extended to the plaintiff corporation.)

{15}     Based on this combination of factors, the court concludes that it need not resolve any issue of whether privilege fails to attach solely because Ebinger's ownership interest in SCR-Tech is too limited.  (Pl. SCR-Tech, LLC's Supplemental Mem. of Law in Opp'n to Defs.' Mot. to Compel the Produc. of Privileged Rs. 6.)

{16}     In sum, the court determines that the attorney-client privilege extends to SCR-Tech for this first category of communications and Defendants' Motion is DENIED as to the documents in this category.

B.     Communications Between SCR-Tech and Catalytica After February 23, 2004

{17}     SCR-Tech alleges that the communications between SCR-Tech, Catalytica, and counsel after Catalytica acquired SCR-Tech contain legal communications and are protected by the attorney-client privilege as shared between SCR-Tech and Catalytica as parent and subsidiary.  Specifically, SCR-Tech contends these documents "all relate to intellectual property issues or disputes with third parties."  (Pl. SCR-Tech, LLC's Supplemental Mem. of Law in Opp'n to Defs.' Mot. to Compel the Produc. of Privileged Rs. 6.)  SCR-Tech represents that they have produced these documents in redacted form, redacting only those portions containing attorney-client communications between SCR-Tech and Catalytica.  (Pl. SCR-Tech, LLC's Supplemental Mem. of Law in Opp'n to Defs.' Mot. to Compel the Produc. of Privileged Rs. 2–3.)

{18}     As of February 23, 2004, Catalytica acquired total ownership of SCR-Tech.  (Am. Compl. ¶ 28.)  The combination of ownership and a shared legal interest is adequate to protect the privilege asserted.  Therefore, Defendants' Motion is DENIED as to this second category of documents.

C.    Communications with Ebinger Created after December 2010

{19}    This third category of documents relates to communications created after there was no longer any corporate affiliation between Ebinger and SCR-Tech. Some of the withheld documents appear by their description in the privilege log to relate to communications seeking to coordinate positions taken in two separate lawsuits, one involving SCR-Tech and one involving Ebinger, with Defendants being involved in each. Other communications may relate solely to SCR-Tech's litigation, with Ebinger providing information to assist SCR-Tech pursuant to the Cooperation Agreement. The court concludes that the common-interest privilege applies differently between these communications.

{20}    As this Court previously held in *Morris v. Scenera Research, LLC*, the common-interest doctrine extends the protection of the attorney-client privilege only to communications between parties sharing a common interest about a legal matter. 2011 NCBC LEXIS 34, at *19 (N.C. Super. Ct. Aug. 26, 2011). "Generally, the privilege has been adopted to facilitate communications between separate groups of counsel representing separate clients having similar interests and actually cooperating in pursuit of those interests." *Id.* at *20; *see also In re Grand Jury Subpoena Under Seal*, 415 F.3d 333, 341 (4th Cir. 2005); *Hanson v. U.S. Agency for Intern. Dev.*, 372 F.3d 286 (4th Cir. 2004); *In re Grand Jury Subpoenas, 89-3 & 89-4, John Doe 89-129*, 902 F.2d 244, 249 (4th Cir. 1990).

{21}    This is different than a common business interest that may be impacted by litigation involving one of the parties. "[A] party seeking to rely on the common interest doctrine must demonstrate that the specific communications at issue were designed to facilitate a common *legal* interest; a business or commercial interest will not suffice." 6 James Wm. Moore et al., *Moore's Federal Practice* ¶ 26.49 (3d ed. 2013) (emphasis added); *see also Maxtena, Inc. v. Marks*, 2013 U.S. Dist. LEXIS 42332, at *23 ("Courts uniformly hold that, in order for the doctrine to apply, 'the common interest must be legal in nature.' . . . Accordingly, the doctrine 'does not encompass a joint business strategy which happens to include as one of its

elements a concern about litigation.'" (quoting *Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Trust No. 1B*, 230 F.R.D. 398 (D. Md. 2005))). Accordingly, "a party requesting that the court apply this rule must demonstrate that (1) the communicating parties shared an identical legal interest, (2) the communication was made in the course of and in furtherance of the joint legal effort, and (3) the privilege had not been waived." *Morris*, 2011 NCBC LEXIS 34, at *20 (citing *Neighbors Law Firm, P.C. v. Highland Capital Mgmt., L.P.*, No. 5:09-CV-353-F, 2011 WL 761480 at *3 (E.D.N.C. Feb. 24, 2011)). The Fourth Circuit has stated that it "demands more than 'conclusory statements' as to the identity of legal interest . . . ." *Baltimore Scrap Corp. v. David J. Joseph Co.*, 1996 U.S. Dist. LEXIS 18617, at *31–32 (D. Md. 1996).[2]

{22}    In addition to challenging whether Ebinger and SCR-Tech share an identical legal interest, Defendants assert that the court should follow the Fourth Circuit's requirement of an actual agreement to prosecute claims, which would defeat the privilege here. *See Hunton & Williams v. United States Dep't of Justice*, 590 F.3d 272, 287 (4th Cir. 2010) ("The common interest doctrine requires a meeting of the minds, but it does not require that the agreement be reduced to writing or that litigation actually have commenced.")[3] (Opening Br. in Supp. of Defs.' Mot. to Compel Ebinger/Envica Docs. on Privilege Log 7.) While challenging any such requirement, SCR-Tech responds that SCR-Tech and Ebinger entered into a Cooperation Agreement on June 23, 2011, which SCR-Tech contends would satisfy any such requirement the court might impose. (Pl. SCR-Tech LLC's Reply in Opp'n

---

[2] The court is aware of criticism of applying a strict requirement of identicality of the legal interest. *See Teleglobe USA, Inc.*, 493 F.3d at 365. Those distinctions are not implicated by the facts of this case and the court need not address them.

[3] A number of circuits require some form of agreement between parties asserting the common-interest doctrine, even if the agreement need not be in writing. *See, e.g. SEC, Inc. v. Wyly*, 2011 U.S. Dist. LEXIS 80304, at *7 ("It must be shown by the party claiming the privilege: (1) that all clients and attorneys with access to the communication had in fact agreed upon a joint approach to the matter communicated . . . ."), *Pac. Pictures Corp. v. U.S. Dist. Court for the Cent. Dist. of Cal. (In re Pac. Pictures Corp.)*, 679 F.3d 1121, 1129 (9th Cir. 2012) ("[T]he parties must make the communication in pursuit of a joint strategy in accordance with some form of agreement – whether written or unwritten."); *United States v. Balsiger*, 2013 U.S. Dist. LEXIS 96387, at *9 (E.D. Wis. 2013) ("This court agrees with the government's contention that the defendants have failed to establish any joint defense or common interest agreement, express or implied . . . .").

to Defs.' Mot. to Compel the Produc. of Privileged Rs. 2.)  As to the shared legal interest, SCR-Tech contends that, by at least December 2010, it and Ebinger shared a common legal interest, specifically that "both SCR-Tech and Ebinger were adverse to the Defendants in lawsuits over the same catalyst regeneration technology" and had "a shared legal interest in protecting the confidential information and trade secrets about the regeneration process that originated with Ebinger and was later further developed by SCR-Tech."  (Pl. SCR-Tech, LLC's Supplemental Mem. of Law in Opp'n to Defs.' Mot. to Compel the Produc. of Privileged Rs. 2, 8; Pl. SCR-Tech LLC's Reply in Opp'n to Defs.' Mot. to Compel the Produc. of Privileged Rs. 5.)

{23}    The Cooperation Agreement, in relevant part, provides:

> 4.1    [Envica Kat GmbH] agrees to cooperate with SCR regarding SCR's lawsuit against Evonik Energy Services, LLC, Hans and Brigitte Hartenstein and Evonik's German parent entities, all at no cost to [Envica Kat GmbH].  Any costs involved with [Envica Kat GmbH] so cooperating with SCR regarding SCR's lawsuit against the Evonik parties . . . will be paid for by SCR.

> 4.2    SCR warrants that Evonik's appeal before the North Carolina Court of Appeals has been effectively terminated and SCR has no further claims whatsoever against [Envica Kat GmbH] connected therewith, SCR waives any such claims and [Envica Kat GmbH] accepts such waiver.

(Opening Br. in Supp. of Defs.' Mot. to Compel Ebinger/Envica Docs. on Privilege Log Ex. E.)

{24}    The court perceives a distinction between, on the one hand communications between Ebinger and  SCR-Tech to coordinate positions to be taken in the separate lawsuits between them and Defendants, and on the other hand, communications by which Ebinger provided SCR-Tech assistance in the present litigation pursuant to the Cooperation Agreement.  While the issues in the two lawsuits were somewhat distinct, the court believes that the fact that each was an adverse party to Defendants involving related technology is adequate to support a common interest privilege so long as the communications were designed to pursue a coordinated strategy.  On the other hand, communications intended solely to

facilitate SCR-Tech's pursuit of its claims in the present lawsuit may relate to a common business interest, but do not rise to a level of shared legal interest adequate to support a common interest privilege. More specifically, the court concludes that Ebinger's interest, evidenced by the Cooperation Agreement and SCR-Tech's description of the shared interest, is a business interest, not a legal interest in the trade secrets and confidential information implicated by the present lawsuit. *See United States v. Aramony*, 88 F.3d 1369, 1392 (4th Cir. 1996) (similarly rejecting the application of the common-interest doctrine because "[t]he development of defenses to allegations against [a former employee accused of improperly using his employer's funds] simply is not a legal matter to [the employer]. Although these defenses could help preserve [the employer's] reputation, the preservation of one's reputation is not a legal matter."); *Bank of Am., N.A. v. Terra Nova Ins. Co.*, 211 F. Supp. 2d 493, 497 (S.D.N.Y. 2002) ("the common interest doctrine 'does not encompass a joint business strategy which happens to include as one of its elements a concern about litigation.'" (quoting *Bank Brussels Lambert v. Credit Lyonnois (Suisse) S.A.*, 160 F.R.D. 437, 447 (S.D.N.Y. 1995))); *Baltimore Scrap Corp.*, 1996 U.S. Dist. LEXIS 18617, at *18–32 (rejecting the application of the common-interest doctrine where the party asserting the doctrine's application ("DJJ") did not show how the other entities with whom it shared information would be affected by the allegations against DJJ); *Fed. Election Comm'n v. The Christian Coal.*, 178 F.R.D. 61, 73 (E.D. Va. 1998) (finding that an individual did not share a common legal interest with a corporation involved in litigation because "[h]e was not 'interested' in the [] litigation in the sense that the outcome of the litigation would directly affect him . . . .").

{25}     The claims pending in this case include (1) Breach of the Confidentiality Agreement between SCR-Tech and the Hartensteins; (2) Tortious Interference with the same Confidentiality Agreement by Evonik; (3) Misappropriation of Trade Secrets; (4) Breach of Fiduciary Duties allegedly owed to SCR-Tech by the Hartensteins; (5) Usurpation of SCR-Tech's Corporate Opportunities by the Hartensteins; and (6) Unfair and Deceptive Trade Practices.

(Am. Compl. ¶¶ 68–108.) These claims do not affect any legal interest of Ebinger; the Amended Complaint does not allege that any of the trade secrets or confidential information at issue are owned by Ebinger, and does not imply in any way that Ebinger will be legally affected by the outcome of any of the claims. *See Fed. Election Comm'n*, 178 F.R.D. at 73. The Cooperation Agreement appears to be more in the nature of "a joint business strategy which happens to include as one of its elements a concern about litigation," *Bank of Am., N.A.*, 211 F. Supp. 2d at 497, providing that "[Ebinger] and SCR agree to cooperate with one another in matters which could improve each of [Ebinger's] and SCR's businesses," and that Ebinger and SCR-Tech "agree to collaborate with one another in research and developments of improvements to their respective technology . . . ." (Opening Br. in Supp. of Defs.' Mot. to Compel Ebinger/Envica Docs. on Privilege Log Ex. E at §§ 2.1, 3.1.) Ebinger's prior ownership in SCR-Tech does not provide the interest necessary to assert a present joint legal interest.

{26} In sum, as to those communications in and after 2010, the court concludes that communications between SCR-Tech, Ebinger, and their counsel for the purposes of developing and pursuing joint strategies in response to claims or defenses asserted separately against them by Defendants are privileged. However, other communications between them to support SCR-Tech's pursuit of its claims against Defendants pursuant to and because of the Cooperation Agreement are not privileged simply because of a former common interest in and/or development of the underlying catalyst regeneration technology.

{27} Having found that a privilege extended to those documents described above, the court must then address Defendants' contention that the earlier production of documents by SCR-Tech's former counsel constituted a subject matter waiver of the privilege. (Reply in Supp. of Defs.' Mot. to Compel Ebinger/Envica Ds. on Privilege Log 7–8.) The court does not believe that a waiver has been demonstrated. The privilege the court has upheld relates to coordination between the companies as to the separate lawsuits adverse to Defendants. The record demonstrates that the documents produced by Womble Carlyle Sandridge & Rice,

LLP were created from August to October, 2009, prior to the time that SCR-Tech claims that the privilege arose as to this category of documents. (Pl. SCR-Tech, LLC's Supplemental Mem. of Law in Opp'n to Defs.' Mot. to Compel the Produc. of Privileged Rs. 10.; (Pl. SCR-Tech LLC's Reply in Opp'n to Defs.' Mot. to Compel the Produc. of Privileged Rs. 7–8.)

{28}   For the foregoing reasons, as to this third category of documents, Defendants' Motion is GRANTED in part and DENIED in part.

IT IS SO ORDERED, this the 13th day of August, 2013.